## AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA ET AL. *v.* CARROLL ET AL.

No. 309. Argued March 4, 1968.—Decided May .20, 1968.*

*Together with No. 310, *Carroll et al.* v. *American Federation of Musicians of the United States and Canada et al.*, also on certiorari to the same court.

*Ronald Rosenberg* argued the cause for petitioners in No. 309 and respondents in No. 310. With him on the briefs were *Henry Kaiser, Eugene Gressman, George Kaufmann, Jerome H. Adler,* and *David I. Ashe.*

*Godfrey P. Schmidt* argued the cause and filed briefs for respondents in No. 309 and petitioners in No. 310.

Briefs of *amici curiae* were filed by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations, and by *Shayle P. Fox* and *Samuel H. Young* for the National Association of Orchestra Leaders.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This action for injunctive relief and treble damages alleging violations of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1 and 2, was brought in the District Court for the Southern District of New York against the petitioners in No. 309, American Federation of Musicians and its Local 802.[1] The question is whether union practices of the petitioners affecting orchestra leaders violate the Sherman Act as activities in combination with a "non-labor" group, or are exempted by the Norris-LaGuardia Act as activities affecting a "labor" group which is party to a "labor dispute."[2] After a

---

[1] Peterson and Carroll, respondents in No. 309, filed the first action in July 1960 and the other in December 1960. The latter was brought to challenge an increase in the musicians' wage scale adopted after the first complaint was filed. The other respondents were allowed to intervene. By stipulation the testimony in *Carroll* v. *Associated Musicians,* 206 F. Supp. 462, 316 F. 2d 574, and *Cutler* v. *American Federation of Musicians,* 211 F. Supp. 433, 316 F. 2d 546, was made part of the record.

[2] § 13 (c), 47 Stat. 73, 29 U. S. C. § 113 (c); see also §§ 6 and 20 of the Clayton Act, 38 Stat. 731, 738, 15 U. S. C. § 17, 29 U. S. C. § 52.

five-week trial without a jury the District Court dismissed the action on the merits, holding that all of the petitioners' practices brought in question "come within the definition of the term 'labor dispute' . . . and are exempt from the antitrust laws." 241 F. Supp. 865, 894. The Court of Appeals for the Second Circuit reversed on the issue of alleged price fixing, but in all other respects affirmed the dismissal. 372 F. 2d 155. Both parties sought certiorari, in No. 309 the petitioners from the reversal of the dismissal in respect of alleged price fixing, and in No. 310 the respondents from the affirmance of the dismissal in the other respects. We granted both petitions, 389 U. S. 817. We hold that the District Court properly dismissed the action on the merits, and that the Court of Appeals should have affirmed the District Court judgment in its entirety.

## I.

The petitioners are labor unions of professional musicians. The union practices questioned here are mainly those applied to "club-date" engagements of union members. These are one-time engagements of orchestras to provide music, usually for only a few hours, at such social events as weddings, fashion shows, commencements, and the like.[3] The purchaser of the music, e. g., the father of the bride, the chairman of the events, etc., makes arrangements with a musician, or with a musician's booking agent, for an orchestra of a conductor and a given number

---

[3] "Musical engagements are generally classified as either 'steady,' those lasting for longer than one week, or 'single,' usually one day or one performance affairs but including all engagements lasting less than one week. The much sought after steady engagements are rare in comparison with the number of single engagements. "The predominant form of single engagement is the 'club date'. . . . Single engagements also include the 'non-club date' field, consisting of television appearances or recording engagements, etc. . . ." 372 F. 2d, at 158.

of instrumentalists, or "sidemen," at a specified time and place. The musician in such cases assumes the role of "leader" of the orchestra, obtains the "sidemen" and attends to the bookkeeping and other details of the engagement. Usually the "leader" performs with the orchestra, sometimes only conducting but often also playing an instrument. When he does not personally appear, he designates a "subleader" who conducts for him and often also plays an instrument.

A musician performing "club-dates" may perform in different capacities on the same day or during the same week, at times as leader and other times as subleader or sideman. The four respondents, however, are musicians who usually act as leaders and maintain offices and employ personnel to solicit engagements through advertising and personal contacts. When two or more engagements are accepted for the same time, each of the respondents will conduct, and, except respondent Peterson, sometimes play, at one and designate a subleader to perform the functions of leader at the other.[4]

The four respondents were members of the petitioner Federation and Local 802 when this suit was filed.[5] Virtually all musicians in the United States and the great

_____

[4] Both the District Court and the Court of Appeals held that respondents did not prove that they properly represented a class under former Fed. Rule Civ. Proc. 23 (a), 241 F. Supp., at 884–886; 372 F. 2d, at 161–163. The record sustains this conclusion. *Supreme Tribe of Ben-Hur* v. *Cauble*, 255 U. S. 356; *Hansberry* v. *Lee*, 311 U. S. 32. Since all of the respondents either play an instrument or conduct their orchestras unless they book more than one engagement for the same time, we do not have before us a leader who merely books engagements and never appears with his orchestra.

[5] Carroll and Peterson have since been expelled from membership. See 241 F. Supp., at 870. Both are still permitted to book engagements and hire musicians to play at them but cannot appear with their orchestra either as conductors or instrumentalists. See *Carroll* v. *American Federation of Musicians*, 310 F. 2d 325.

majority of the orchestra leaders are union members. There are no collective bargaining agreements in the club-date field.[6] Club-date engagements are rigidly regulated by unilaterally adopted union bylaws and regulations. Under these bylaws and regulations

(1) Petitioners enforce a closed shop and exert various pressures upon orchestra leaders to become union members.

(2) Orchestra leaders must engage a minimum number of sidemen for club-date engagements.

(3) Orchestra leaders must charge purchasers of music minimum prices prescribed in a "Price List Booklet." The prices are the total of (a) the minimum wage scales for sidemen, (b) a "leader's fee" which is double the sideman's scale when four or more musicians compose the orchestra, and (c) an additional 8% to cover social security, unemployment insurance, and other expenses. When the leader does not personally appear at an engagement, but designates a subleader and four or more musicians perform, the leader must pay the subleader one and one-half times the wage scale out of his "leader's fee."

(4) Orchestra leaders are required to use a form of contract, called the Form B contract, for all engagements. In the club-date field, however, Local 802 accepts assurances that the terms of club-date engagements comply with all union regulations and provide for payment of the minimum wage. Union business agents police compliance.

---

[6] "The distinction between the kinds of single engagements is vital; the non-club date engagements are ordinarily governed by collective bargaining agreements . . . . The same is usually true of the steady engagement field. Local 802 has collective bargaining agreements with the major users or 'purchasers' of live music within its area such as recording companies, hotels, television and film producers, opera companies and theatres." 372 F. 2d, at 158.

(5) Additional regulations apply to traveling engagements. The leader of a traveling orchestra must charge 10% more than the minimum price of either the home local or of the local in whose territory the orchestra is playing, whichever is greater.

(6) Orchestra leaders are prohibited from accepting engagements from or making any payments to caterers.

(7) Orchestra leaders may accept engagements made by booking agents only if the booking agents have been licensed by the unions under standard forms of license agreements provided by the unions.

The District Court assumed, and the Court of Appeals held, that orchestra leaders in the club-date field are employers and independent contractors.[7] Respondents argue that petitioners' involvement of the orchestra leaders in the promulgation and enforcement of the challenged regulations and bylaws creates a combination or conspiracy with a "non-labor" group which violates the Sherman Act. *Allen Bradley Co.* v. *Union,* 325 U. S. 797, 800; *Los Angeles Meat & Provision Drivers Union* v. *United States,* 371 U. S. 94; *Mine Workers* v. *Pennington,* 381 U. S. 657. But the Court of Appeals concurred in the finding of the District Court that such orchestra leaders, although deemed to be employers and independent contractors, constitute not a "non-labor" group but a "labor" group. 372 F. 2d, at 168.[8]

The criterion applied by the District Court in determining that the orchestra leaders were a "labor" group

---

[7] See 241 F. Supp., at 887; 372 F. 2d, at 159. We need not decide the question.

[8] The Court of Appeals also found "no evidence of a conspiracy between Local 802, or the Federation, and orchestra leaders to eliminate competitors, fix prices or achieve any other commercial restraint, nor was such a finding made by the district judge. Rather, the record establishes that all restraints were instituted unilaterally by the unions and acquiesced in by the orchestra leaders." 372 F. 2d, at 164; see 241 F. Supp., at 891.

and parties to a "labor dispute" was the "presence of a job or wage competition or some other economic inter-relationship affecting legitimate union interests between the union members and the independent contractors. If such a relationship existed the independent contractors were a 'labor group' and party to a labor dispute under the Norris-LaGuardia Act." 241 F. Supp., at 887. The Court of Appeals held, and we agree, that this is a correct statement of the applicable principles. The Norris-LaGuardia Act took all "labor disputes" as therein defined outside the reach of the Sherman Act and established that the allowable area of union activity was not to be restricted to an immediate employer-employee relation. *United States* v. *Hutcheson,* 312 U. S. 219, 229–236; *Allen Bradley Co.* v. *Union, supra,* at 805–806; *Los Angeles Meat & Provision Drivers Union* v. *United States, supra,* at 103; *Milk Wagon Drivers' Union* v. *Lake Valley Farm Prods.,* 311 U. S. 91. "This Court has recognized that a legitimate aim of any national labor organization is to obtain uniformity of labor standards and that a consequence of such union activity may be to eliminate competition based on differences in such standards." *Mine Workers* v. *Pennington,* 381 U. S. 657, 666.

The District Court found that the orchestra leaders performed work and functions which actually or potentially affected the hours, wages, job security, and working conditions of petitioners' members.[9] These findings have substantial support in the evidence and in the light of the job and wage competition thus established, both courts correctly held that it was lawful for petitioners to pressure the orchestra leaders to become union mem-

---

[9] "[I]n the club date and hotel steady engagement fields . . . orchestra leaders are in competition with employee members of the . . . unions regarding jobs, wages and other working conditions. As a result, they comprise a labor group in these fields." 241 F. Supp., at 887–888.

bers, *Los Angeles Meat Drivers, supra,* and *Milk Wagon Drivers', supra,* to insist upon a closed shop, *United States* v. *American Federation of Musicians,* 318 U. S. 741, affirming 47 F. Supp. 304, to refuse to bargain collectively with the leaders, see *Hunt* v. *Crumboch,* 325 U. S. 821, to impose the minimum employment quotas complained of, *United States* v. *American Federation of Musicians, supra,* to require the orchestra leaders to use the Form B contract, see *Teamsters Union* v. *Oliver,* 362 U. S. 605 (*Oliver II*), and to favor local musicians by requiring that higher wages be paid to musicians from outside a local's jurisdiction, *Rambusch Decorating Co.* v. *Brotherhood of Painters,* 105 F. 2d 134.

The District Court also sustained the legality of the "Price List" stating, "In view of the competition between leaders and sidemen and subleaders which underlies the finding that the leaders are a labor group, the union has a legitimate interest in fixing minimum fees for a participating leader and minimum engagement prices equal to the total minimum wages of the sidemen and the participating leader." 241 F. Supp., at 890. The Court of Appeals, one judge dissenting, disagreed that the "Price List" was within the labor exemption, stating that "the unions' establishment of price floors on orchestral engagements constitutes a per se violation of the Sherman Act." 372 F. 2d, at 165. The premise of the majority's conclusion was that the "Price List" was disqualified for the exemption because its concern is "prices" and not "wages." But this overlooks the necessity of inquiry beyond the form. MR. JUSTICE WHITE's opinion in *Meat Cutters* v. *Jewel Tea,* 381 U. S. 676, 690, n. 5, emphasized that "[t]he crucial determinant is not the form of the agreement—*e. g.,* prices or wages—but its relative impact on the product market and the interests of union members." It is therefore not dispositive of the question that petitioners' regulation in form establishes price floors.

The critical inquiry is whether the price floors in actuality operate to protect the wages of the subleader and sidemen. The District Court found that the price floors were expressly designed to and did function as a protection of sidemen's and subleaders' wage scales against the job and wage competition of the leaders. The Court said:

> "As a consequence of this relationship, the practices of [orchestra leaders] when they lead and play must have a vital effect on the working conditions of the non-leader members of the union. If they undercut the union wage scale or do not adhere to union regulations regarding hours or other working conditions when they perform they will undermine these union standards. They would put pressure on the union members they compete with to correspondingly lower their own demands." 241 F. Supp., at 888.

The Court of Appeals itself expressed a similar view in saying:

> "even those orchestra leaders who, as employers in club dates, lead but never perform as players, are proper subjects for membership because they are in job competition with union sub-leaders; each time a non-union orchestra leader performs, he displaces a 'union job' with a 'non-union job.'" 372 F. 2d, at 168.

And of particular significance, the Court of Appeals noted that where the leader performs

> "the services of a sub-leader would not be required and the leader may in this way save the wages he would otherwise have to pay. Consequently, he could make the services of his orchestra available at a lower price than could a non-performing leader." 372 F. 2d, at 166.

Thus the price floors, including the minimums for leaders, are simply a means for coping with the job and wage competition of the leaders to protect the wage scales of musicians who respondents concede are employees on club-dates, namely sidemen and subleaders. As such the provisions of the "Price List" establishing those floors are indistinguishable in their effect from the collective bargaining provisions in *Teamsters Union* v. *Oliver*, 358 U. S. 283 (*Oliver I*), which we held governed not prices but the mandatory bargaining subject of wages. The precise issue in *Oliver I* was whether Article XXXII of a multi-employer, multistate collective bargaining agreement between the Teamsters Union and a bargaining organization of motor carriers dealt with a mandatory subject of bargaining. Article XXXII provided that drivers who own and drive their own vehicles should be paid, in addition to the prescribed driver's wage, not less than a prescribed minimum rental for the use of their vehicles. We held that the article was a wage and not a price provision, saying:

> "The inadequacy of a rental which means that the owner makes up his excess costs from his driver's wages not only clearly bears a close relation to labor's efforts to improve working conditions but is in fact of vital concern to the carrier's employed drivers; an inadequate rental might mean the progressive curtailment of jobs through withdrawal of more and more carrier-owned vehicles from service. . . ." 358 U. S., at 294.

We disagree with the Court of Appeals that "[t]he circumstances constituting a possible threat to the employment of sub-leaders or the displacement of a sideman . . . are not at all comparable," 372 F. 2d, at 166. The price floors here serve the identical ends served by Article XXXII in *Oliver I*. The Price List has in common with

.

Article XXXII the objective to protect employees' job opportunities and wages from job and wage competition of other union members—in the case of the Article, drivers when they drive their own vehicles, and in the case of the Price List, musicians on the occasions they are leaders and play a role as employers. Like the Article, the Price List is therefore "a direct and frontal attack upon a problem thought to threaten the maintenance of the basic wage structure . . . ." 358 U. S., at 294.[10]

The majority of the Court of Appeals apparently regarded *Meat Cutters* v. *Jewel Tea, supra,* as militating against this conclusion. The majority read the opinions of MR. JUSTICE WHITE and Mr. Justice Goldberg in that case as requiring a holding that "mandatory subjects of collective bargaining carry with them an exemption . . . ," but that "[o]n matters outside of the mandatory area . . . no such considerations govern . . . ." 372 F. 2d, at 165. Even if only mandatory subjects of bargaining enjoy the exemption—a question not in this case and upon which we express no view—nothing MR. JUSTICE WHITE or Mr. Justice Goldberg said remotely suggests that the distinction between mandatory and nonmandatory subjects turns on the form of the method taken to protect a wage scale, here a price floor. To the

---

[10] The "Price List" establishes only a minimum charge; there is no attempt to set a maximum. Nor does the union attempt by its minimum charge to assure the leader a profit above the fair value of his labor services. The District Court found no evidence "which indicates that the increment to the [leader] is unrelated to his costs in that function." 241 F. Supp., at 891. See also 372 F. 2d, at 170 (Friendly, J., in separate opinion): "A different result might be warranted if the floor were set so high as to cover not merely compensation for the additional services rendered by a leader but entrepreneurial profit as well. But there has been no such showing here."

contrary, we pointed out above that MR. JUSTICE WHITE's opinion emphasized that the "crucial determinant is not the form of the agreement . . ." and cited *Oliver I* as settling that proposition. 381 U. S., at 690, n. 5.

The reasons which entitle the Price List to the exemption embrace the provision fixing the minimum price for a club-date engagement when the orchestra leader does not perform, and does not displace an employee-musician.[11] That regulation is also justified as a means of preserving the scale of the sidemen and subleaders. There was evidence that when the leader does not collect from the purchaser of the music an amount sufficient to make up the total of his out-of-pocket expenses, including the sum of his wage-scale wages and the scale wages of the sidemen,[12] he will, in fact, not pay the sidemen the prescribed scale. The District Court found:

> "It is unquestionably true that skimping on the part of the person who sets up the engagement [the leader] so that his costs are not covered is likely to have an adverse effect on the fees paid to the participating musicians. By fixing a reasonable amount over the sum of the minimum wages of the musicians participating in an engagement to cover these

---

[11] Because of the intense competition for positions as leader, the full-time leader "displaces" another union member simply by securing an engagement for himself. Union members who act principally as sidemen and subleaders but who act occasionally as leaders "bid for the same jobs as full-time leaders such as plaintiffs and perform the same musical service when they get a job. They also perform in the same places as full-time leaders." 241 F. Supp., at 872.

[12] Only two things can happen when the leader does not charge the specified minimum; either he works below union scale or the musicians he employs work below union scale. In either event the result is price competition through differences of standards in the labor market.

> expenses, the union insures that 'no part of the labor costs paid to a [leader] would be diverted by him for overhead or other non-labor costs.' " 241 F. Supp., at 891.

In other words, the price of the product—here the price for an orchestra for a club-date—represents almost entirely the scale wages of the sidemen and the leader. Unlike most industries, except for the 8% charge, there are no other costs contributing to the price. Therefore, if leaders cut prices, inevitably wages must be cut.

The analyses of MR. JUSTICE WHITE and Mr. Justice Goldberg in *Jewel Tea* support our conclusion. *Jewel Tea* did not hold that an agreement respecting marketing hours would always come within the labor exemption. Rather, that case held that such an agreement was lawful because it was found that the marketing-hours restriction had a substantial effect on hours worked by the union members. Similarly, the price-list requirement is brought within the labor exemption under the finding that the requirement is necessary to assure that scale wages will be paid to the sidemen and the leader. If the union may not require that the full-time leader charge the purchaser of the music an amount sufficient to compensate him for the time he spends selecting musicians and performing the other musical functions involved in leading, the full-time leader may compete with other union members who seek the same jobs through price differentiation in the product market based on differences in a labor standard. His situation is identical to that of a truck owner in *Oliver I* who does not charge an amount sufficient to compensate him for the value of his labor services in driving the truck, and is a situation which the union can prevent consistent with its antitrust exemption. There can be no differentiation between the leader who appears with his orchestra and

the one who on occasion hires a subleader. In either case part of the union-prescribed "leader's fee" is attributable to service rendered in either conducting or playing and part to the service rendered in selecting musicians, bookkeeping, etc. The only difference is that in the former situation the leader keeps the entire fee while in the latter he is required to pay that part of it attributable to playing or conducting to the subleader. In this respect we agree with the view espoused by Judge Friendly in his separate opinion, 372 F. 2d, at 168–170.

We think also that the caterer and booking agent restrictions "are at least as intimately bound up with the subject of wages," *Oliver II, supra,* at 606, as the price floors. The District Court found that the booking agent regulations were adopted because of experience that "many booking agents charged exorbitant fees to members and booked engagements for musicians at wages which were below union scale." 241 F. Supp., at 881–882. On the basis of these findings, the District Court concluded:

> "Because the activities of the booking agents here have and had a direct and substantial effect on the wages of the members of [the unions], I find that they are in an economic interrelationship with the members . . . such that the [unions] are justified in regulating their activities . . . . Furthermore, I find the regulations to be reasonably related to their interest in maintaining observance of union scale wages and working conditions." 241 F. Supp., at 893.

The finding concerning the caterer regulations was to the same effect.

> "The evidence discloses that caterers took advantage of their position before the union adopted its regulations to, in effect, book orchestras and they

continue to do so, at least to some extent. Caterers recommend orchestras to customers and receive commissions from orchestra leaders. These practices actually or potentially affect the wages of the musicians involved.

"I believe that this constitutes an economic interrelationship which permits the defendants to regulate and prohibit the booking activities of the caterers without violating the Sherman Act." 241 F. Supp., at 893.

The judgment of the Court of Appeals is vacated and the cases are remanded with direction to enter a judgment affirming the judgment of the District Court in its entirety.

*It is so ordered.*

THE CHIEF JUSTICE and MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.

MR. JUSTICE WHITE, with whom MR. JUSTICE BLACK joins, dissenting.

In my view the Court is misled by the peculiar role of bandleaders and the peculiar economics of the club-date music industry, and fashions a rule which, if comprehensible at all, has unfortunate consequences for the delicate and difficult area of conflict between antitrust and labor policy.

The four respondents in No. 309 (hereafter respondents) are successful bandleaders whose success has made it unnecessary for them to continue working from time to time as sidemen and subleaders. However they do work as leaders.[1] Indeed, their business practice was to lead

---

[1] Rather, they worked as leaders until their insubordination resulted in expulsion from the union. See 241 F. Supp. 865, 870 (D. C. S. D. N. Y. 1965).

individually whenever they obtained an engagement, hiring a subleader only when they obtained two or more engagements at conflicting times. Leading a band was obviously one important part of their working careers; it was not, however, the only part. Respondents also devoted much time and energy to organizing and managing their businesses. They advertised, and in other ways obtained engagements. They planned the music to be provided at those engagements. They chose, recruited, and supervised the subleaders and sidemen working for them. And they established and directed the administrative operation necessary for obtaining and fulfilling engagements.

The Court accepts the finding that respondents were a "labor" group. I would think it beyond dispute that leading a band (a task which usually includes also occasional playing of an instrument) is "labor group work," but that it is equally beyond dispute that managing and administering a business whose function is supplying bands to fathers of brides is not "labor group work." [2] The first task, leading, certainly possesses "economic interrelationship[s] affecting legitimate union interests," [3] and the second clearly does not. The Court appears to feel that because respondents' work includes some "labor group" tasks, all aspects of respondents' activities are proper subjects of union concern. I see no reason why the law in this area cannot be sufficiently flexible to grant the union antitrust immunity for regulation of those activities of bandleaders which sufficiently affect union members, while denying that immunity where the union has no proper concern.

*Teamsters Union* v. *Oliver,* 358 U. S. 283 (1959), is a difficult case, but an important one, with which I fully

---

[2] See *Columbia River Packers Assn.* v. *Hinton,* 315 U. S. 143 (1942).

[3] 241 F. Supp., at 887.

agree.[4] *Oliver*, as I read it, holds that where independent contractors are doing work for an employer in competition with the work of union members, the union can bargain with the employer to make certain they are not doing that work at a lower wage than that paid to members.[5] Since in *Oliver* an independent truck driver who claimed to be charging the union rate for his labor but received in addition less than his costs for equipment and gasoline would in fact be cutting the union wage scale, the Court held that the union did not violate the antitrust laws when it bargained about the total amount—including both wage and equipment costs— that the companies would pay to the independent owner-drivers. On the facts before us, *Oliver* is relevant, but not across-the-board, as the Court seems to think. Here, when one of respondents leads, he does work—playing and leading—which is also done by union members, and for which the union has a proper concern. The union thus has a right to see that the respondent does not perform that work for less than the going scale for union musicians and subleaders. Since the leader fixes a single charge to compensate him for both leading and organizing, the union can require the leader to make that charge not less than the union scale for a subleader plus the leader's costs in obtaining the engagement, hiring the musicians, and planning the program. Since, as Judge Friendly said in his separate opinion below, the price the union requires leaders to charge has not been shown to be "set so high as to cover not merely compensation for the additional services rendered by a leader

---

[4] See *Meat Cutters* v. *Jewel Tea Co.*, 381 U. S. 676, 690, n. 5 (1965).

[5] The union could have bargained for restrictions on contracting out of work by the employer. *Fibreboard Paper Products Corp.* v. *NLRB*, 379 U. S. 203 (1964).

but entrepreneurial profit as well," [6] the union should be free of antitrust liability for imposing this minimum rate on charges by leaders when they actually lead. *Oliver* so holds.

The question is quite different, however, when we deal with imposition of fixed minimum charges by leaders for engagements at which they do not themselves lead. For such engagements the role of the leader is solely that of entrepreneur: he obtains a customer (partly, it appears, through the attraction of his reputation as an established provider of music), makes the necessary arrangements for servicing the customer, including employment and supervision of staff, and maintains the administrative structure required for this work: office, payroll clerk, permanent telephone listing, and so forth. The union has of course a full right to impose on this leader, who is in effect an employer, its minimum scale for work by sidemen and subleaders. The musicians union, however, goes further. It requires that, for an engagement of four or more musicians, the leader charge his customer not less than the sideman's scale times the number of musicians (including the subleader), plus double the sideman's scale to compensate the leader, of which one-fourth—plus the sideman's scale—goes to the subleader. The union is clearly requiring that the leader charge his customer more than the total of the leader's wage bill, even though the leader himself does no "labor group" work.

There is no clear holding by this Court that a union is not immune from antitrust liability when it requires that all the employers with whom it deals charge uniform prices. It has certainly been assumed, however, that the Norris-LaGuardia exemption to the antitrust laws does not extend this far. In *Meat Cutters* v. *Jewel Tea*

---

[6] 372 F. 2d 155, 170 (C. A. 2d Cir. 1967).

*Co.*, 381 U. S. 676 (1965), the entire Court joined opinions strongly suggesting there is no antitrust immunity for a union which joins with employers to fix the prices at which the employers sell to the public. I wrote, in an opinion joined by THE CHIEF JUSTICE and MR. JUSTICE BRENNAN:

> "Jewel, for example, need not have bargained about or agreed to a schedule of prices at which its meat would be sold and the unions could not legally have insisted that it do so. But if the unions had made such a demand, Jewel had agreed and the United States or an injured party had challenged the agreement under the antitrust laws, we seriously doubt that either the unions or Jewel could claim immunity by reason of the labor exemption, whatever substantive questions of violation there might be." 381 U. S., at 689.

Mr. Justice Goldberg in his separate opinion, joined by JUSTICES HARLAN and STEWART, wrote:

> "The direct and overriding interest of unions in such subjects as wages, hours, and other working conditions, which Congress has recognized in making them subjects of mandatory bargaining, is clearly lacking where the subject of the agreement is price-fixing and market allocation. Moreover, such activities are at the core of the type of anticompetitive commercial restraint at which the antitrust laws are directed." 381 U. S., at 732–733.

MR. JUSTICE DOUGLAS, dissenting in *Jewel Tea* and joined by JUSTICES BLACK and Clark, wrote:

> "[T]he unions can no more aid a group of businessmen to force their competitors to follow uniform store marketing hours than to force them to sell at

fixed prices. Both practices take away the freedom of traders to carry on their business in their own competitive fashion." 381 U. S., at 737.[7]

Unions are, of course, not without interest in the prices at which employers sell. As the majority points out, by seeing that employers sell at prices covering all their costs, a union can insure employer solvency and make more certain employee collection of wages owed them. In addition, assuring that competing employers charge at least a minimum price prevents price competition from exerting downward pressure on wages. On the other hand, price competition, a significant aid to satisfactory resource allocation and a deterrent to inflation, would be substantially diminished if industry-wide unions were free to dictate uniform prices through agreements with employers.[8] I have always thought that this strong policy outweighed the legitimate union interest in the prices at which employers sell, and until today I had thought that the Court agreed. Of course the lack of discussion of this question in the majority's opinion, and the failure to refer to the unanimous rejec-

---

[7] As one commentator has concluded, "Although the Court split on the application of this proposition, all the justices agreed that the antitrust laws would be offended by a collective bargaining agreement binding employers to charge a certain price for their goods." P. Areeda, Antitrust Analysis 52 (1967). See also *Mine Workers* v. *Pennington*, 381 U. S. 657, 663 (1965): "If the UMW in this case, in order to protect its wage scale by maintaining employer income, had presented a set of prices at which the mine operators would be required to sell their coal, the union and the employers who happened to agree could not successfully defend this contract provision if it were challenged under the antitrust laws by the United States or by some party injured by the arrangement."

[8] See J. T. Dunlop, Wage Determination Under Trade Unions (1950); C. E. Lindblom, Unions and Capitalism (1949); E. S. Mason, Economic Concentration and the Monopoly Problem (1957).

tion in *Jewel Tea* of antitrust immunity for union efforts
to fix industry-wide prices, suggest that the Court takes
this step without full awareness of the implications and
the likely consequences. The step is nonetheless dis-
turbing, and I must record my dissent.

I am also in disagreement with the majority about cer-
tain of the questions presented in No. 310. The musicians
union imposes its rules not only on respondents, who
sometimes lead and sometimes hire subleaders, but upon
leaders who never lead personally. These leaders are
merely independent businessmen, performing no "labor
group" work, and the union has no proper interest in reg-
ulating their activities. Even though the District Court
found that the union imposed its rules on these leaders,
I believe the facts as found below demonstrate that the
union formed a combination with those independent
businessmen.[9] If the union and employers combined,
I have no doubt that some of the regulations agreed
upon were unlawful restraints of trade. Boycotting
booking agents and caterers who occasionally did business
with employers not living by the union's rules unrea-
sonably restrained trade. So also did combining with
willing caterers and booking agents to impose uniform
business practices on bandleaders and to boycott those
who did not abide by the established rules and policies.
Agreeing with employers that the employers would not
take their wares to other cities without charging prices
10% higher than the local employers charged was a

[9] *United States* v. *Parke, Davis & Co.*, 362 U. S. 29 (1960). See
also *Albrecht* v. *Herald Co.*, 390 U. S. 145, 150, n. 6 (1968). I can-
not believe that the Court intends its n. 8 to hold that unilateral
demands, enforced by threats, combined with willing cooperation
or reluctant acquiescence by leaders (who may join the union and
in any event obey its rules), cannot amount to a combination in
restraint of trade.

blatant violation of the Sherman Act. Horizontal division of territories has always been held a *per se* violation of § 1, *e. g., Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211 (1899), and it should make no difference that the instigation for this division came from the union and not from the employers. I am unable to see how the practice at issue here is distinguishable from an agreement by General Motors and Ford, at the behest of the UAW, for GM to sell west of the Mississippi only at prices 10% higher than those charged by Ford, while Ford would sell in the East only at prices higher than GM's. Since union combinations with nonlabor groups which restrain trade are not immune from antitrust attack, *Allen Bradley Co.* v. *Union,* 325 U. S. 797 (1945); *Mine Workers* v. *Pennington,* 381 U. S. 657 (1965), I think respondents should be permitted to show that these unlawful and unimmunized restraints of trade injured them, and should be able to recover the trebled amount of such damages as they can establish.

By combining with a nonlabor group, the musicians union has obtained effective control of the entire club-date industry. The device for this control has been imposition of union membership and union rules on cooperating bandleaders, and on some who did not want to cooperate. I am sure the Clayton and Norris-LaGuardia Acts never intended to give unions this kind of stranglehold on any industry. It may be that the Court views this industry as having special problems of supply and demand requiring special treatment under the antitrust laws. If this is the case, the Court should frankly say so and seek to confine the misguided rules of law it announces. More appropriately, the Court should leave to Congress the task of making special provisions in the antitrust laws for the special circumstances of the music industry. On more than one occasion Con-

gress has seen to it that the full rigors of the antitrust laws are not felt by industries which cannot survive under competitive conditions.[10] The Court treads dangerous ground in seeking on its own motion to deny to a particular industry the normal competitive conditions envisioned by the antitrust laws, conditions usually viewed as essential for maintaining service and prices at satisfactory levels.

---

[10] *E. g.,* § 1 of the the Capper-Volstead Act, 42 Stat. 388, 7 U. S. C. § 291 (agricultural cooperatives); § 2 of the Webb-Pomerene Act, 40 Stat. 517, 15 U. S. C. § 62 (foreign trade associations); § 6 (b) (1) of the Act of Nov. 8, 1966, 80 Stat. 1515, 15 U. S. C. § 1291 (1964 ed., Supp. II) (joint agreements by professional football clubs).