**AFL–CIO JOINT NEGOTIATING COMMITTEE FOR PHELPS DODGE,**
etc., et al., Petitioners,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Phelps Dodge Corporation, Intervenor.**

No. 19199.

United States Court of Appeals,
Third Circuit.

Argued Sept. 14, 1971.

Decided March 31, 1972.

As Amended May 25, 1972.

Committee for Phelps Dodge ("the committee" or "the unions") to review and set aside an order of the National Labor Relations Board and upon the Board's cross-application to enforce that order.[1] The Board found that the various unions constituting the committee had engaged in unfair labor practices during negotiations for collective bargaining contracts with Phelps Dodge Corporation and various of its subsidiaries ("Phelps Dodge" or "the company.")

The negotiations involved took place during most of 1967 and part of 1968. Phelps Dodge is engaged, *inter alia*, in the mining, concentrating and smelting of ores, principally copper ore, in the western part of the United States. Its Western Operations division includes four locations in Arizona. Also involved in the negotiations were two wholly-owned subsidiary corporations, Phelps Dodge Refining Corporation, which operates a refinery at El Paso, Texas, and Phelps Dodge Copper Products Corporation, engaged in the manufacture of copper wire and cable at Fordyce, Arkansas, and in Yonkers, New York.

The Board ruled that the unions, by conditioning settlement of negotiations covering the Phelps Dodge Western Operations upon simultaneous and satisfactory settlement of contracts in other bargaining units in other company locations and by striking in support of that demand, had unlawfully attempted to engage in company-wide bargaining beyond the scope of established bargaining units. The Board found that insistence upon simultaneous settlements was part of an over-all strategy by the Arizona unions to enlarge the bargaining unit by merging the bargaining of separate units. It ruled that the conduct of negotiations on a basis broader than the established bargaining unit is non-mandatory, and the unions' insistence that Phelps Dodge engage in such bargaining was violative of the National Labor Relations Act.

Michael H. Gottesman, Bredhoff, Barr, Gottesman, Cohen & Peer, Washington, D. C., for petitioners.

Eugene B. Granof, N.L.R.B., Washington, D. C., for respondent.

John F. Boland, Jr., Evans, Kitchel & Jenckes, Phoenix, Ariz., for intervenor.

Before STALEY, ADAMS and MAX ROSENN, Circuit Judges.

## OPINION OF THE COURT

STALEY, Circuit Judge.

This case comes to us upon the petition of the AFL–CIO Joint Negotiating

---

1. The decision and order of the Board are reported at 184 N.L.R.B. No. 106.

The scope of our review in the instant case is limited to the determination of whether or not the Board's findings are supported by substantial evidence in the record and have a basis in law. NLRB v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); Local Union No. 519, United Ass'n of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry of United States and Canada, A.F.L.–C.I.O. v. NLRB, 135 U.S.App.D.C. 105, 416 F. 2d 1120 (C.A.D.C., 1969).

In the 1967–1968 negotiations the many unions representing employees at the Western Operations bargained through the medium of the AFL–CIO Joint Negotiating Committee for Phelps Dodge.[2] Prior to 1967, bargaining at the Western Operations had varied, being conducted at times on the basis of negotiations with individual unions and at times on the basis of negotiations with combinations of various unions. In 1967, the parties agreed to the joinder of all of the bargaining units in Arizona locations into a single negotiating format,[3] the Joint Committee. At the outset, negotiations were also opening at locations operated by Phelps Dodge subsidiaries in El Paso and Rhode Island. A request was made by the unions that Phelps Dodge agree to joint bargaining on a company-wide basis wherever negotiations were open. The company rejected the request. The unions subsequently abandoned this demand, and separate negotiations ensued at the various company locations.

At this point, the Board and the unions begin to disagree on the facts as well as the law. The Board contends, and the trial examiner so found, that the over-all objective of a company-wide labor agreement was never abandoned and that the unions persisted in pursuing this objective in bargaining with Phelps Dodge. The Board's analysis of the evidence begins with an overview of the nationwide dispute and strike in the copper industry in 1967. The Board notes that the unions representing employee units in this industry joined their efforts and directed them against the four major copper producers, one of which is Phelps Dodge.[4] The bargaining goals which the unions intended to seek throughout the copper industry were formulated in March of 1967 at the unions' Nonferrous Industry Conference. Included among those goals were company-wide master agreements and common contract termination dates. It is the Board's position that the record of negotiations, viewed as a whole, demonstrates that these goals were never abandoned. The Board cites the unions' demand for a "most favored nations" clause,[5] their demand for a limited no strike provision, their demand for common contract expiration dates, and their demand for simultaneous settlements of all contracts as corroborative evidence of an effort to compel Phelps Dodge to engage in company-wide bargaining.

The unions' joint negotiating committee, petitioners in this court, deny that they were attempting to engage in company-wide bargaining. Petitioners candidly admit that one of their bargaining goals had been to establish company master agreements and common expiration dates. They assert that this demand for master agreements was abandoned prior to the strike and contend that their demand for simultaneous set-

---

2. The four bargaining units represented by the I.B.E.W. did not participate in the joint bargaining until late in the negotiations.

3. There is a total of 40 bargaining units in the Arizona operations.

4. The other major copper producers are Kennecott Copper Corp., Anaconda Company, and American Smelting and Refining Co., with their various subsidiaries.

5. This clause provided:
   "When, during the term of this agreement, the Company and the United Steelworkers of America negotiate an agreement covering any other operations of the Company, the Union shall have the right, upon demand, to have any provision of said agreement incorporated into this agreement."

tlements, which they admittedly did not abandon, was not an attempt to engage in illegal company-wide bargaining. Petitioners point out that negotiations were conducted separately in the various units of Phelps Dodge and that there was no insistence on discussion in one locale as to the contract of another locale.

■ We deem it necessary at this point to restate that this matter is before us on a petition to review and set aside an opinion and order of the NLRB. We reiterate in order to emphasize the fact that the Board opinion and order must stand or fall upon the findings of fact and conclusions of law contained therein. In the instant case, counsel for the Board has advanced an argument in support of the Board's order that is really a rationalization of the Board's decision.[6] We may not consider such an argument. "[A]n administrative order cannot be upheld unless the grounds upon which the agency acted . . . were those upon which its action can be sustained." SEC v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). We cannot accept counsel's *post hoc* rationalizations for agency action. NLRB v. Metropolitan Life Insurance Co., 380 U.S. 438, 85 S. Ct. 1061, 13 L.Ed.2d 951 (1965).

The Board found that the strikes conducted by the unions throughout the facilities of Phelps Dodge were intended, in substantial part, to force the company to accede to a demand for an agreement on terms and conditions of employment to be applicable generally on a company-wide basis. After examining the decision by the trial examiner and the Board's opinion, we conclude that the Board's finding was based largely upon its belief that the unions began negotiations with the intention to secure company-wide master contracts and never abandoned that goal. The Board's opinion cites public statements made by union officials during the strike as well as a union publication to support its contention that company-wide bargaining was the principal factor underlying the copper strike. The Board then cites as corroborative evidence of an effort to force company-wide bargaining the unions' insistence to impasse on the demands set forth earlier. Convinced that the unions had never abandoned the objective of company-wide contracts, the Board found those demands to have been mere stratagems to achieve that end.[7]

■■ We find that the Board's opinion and order are not substantiated by the record and are without a basis in law. The Board concedes that it did not find the union's insistence on the four demands to be a per se violation of the Act; rather the Board asserts that those demands were part of an over-all strategy to force the company to negotiate on a basis broader than the established bar-

---

6. The Board's brief argues that the effect of the demands made by the unions would be that employees in other units would receive the same terms and conditions as the employees in the Western Operations. The argument contends that, as a practical matter, the result would be the same as if the unions had negotiated for other units in the Western Operations negotiations. Since such an instance would have been violative of the Act, the Board's counsel contends that a course of conduct that is designed to achieve the same result is likewise violative. This was clearly not the import of the Board's decision, which found that the unions did seek to negotiate about terms and conditions in other units.

7. The Board's decision asserted that the "most favored nations" clause coupled with the limited no-strike provision would have permitted the unions, even though they might have concluded a contract covering the Arizona operations, nevertheless to remain out on strike in concert with the employees in other operations until a contract or contracts had been reached in such other operations, at which juncture the unions in Arizona could then require the company to apply the best terms of the latter contracts to the Arizona operations. The company rejected these demands, characterizing them as demands for company-wide bargaining, and the Board agreed with the company's appraisal.

gaining units. The Board, in the exercise of its discretion, may of course find bad faith bargaining even with regard to mandatory subjects if done with a closed mind. Such a finding must be supported by sufficient evidence of bad faith in the record of negotiations. Texas Foundries, Inc. v. NLRB, 211 F.2d 791 (C.A.5, 1954). The Board's opinion in the instant case, however, does not find that the unions bargained in bad faith. As we read it, the Board's opinion finds that the unions employed mandatory demands to achieve a nonmandatory objective, that of enlarging the bargaining unit. The record in this case will not support such a finding.

■ Separate negotiations were conducted at each of the company's units. As we read it, the Board's opinion finds that, even assuming the unions' demands were mandatory subjects of bargaining, the unions employed those demands to achieve a non-mandatory objective, that of enlarging the bargaining unit. The unions in Arizona insisted to impasse upon their demand for a "most favored nations" clause and a limited no-strike provision. During the strike, these two demands were withdrawn and a demand was made for simultaneous settlement of all contracts. Assuming without deciding, as the Board did, that those demands were all mandatory subjects of bargaining, as such the unions may bargain to impasse on each or all of them. NLRB v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). The fact that they did so is not evidence of an attempt to merge the bargaining of separate units. The Board in this case has equated parallel action by units with an unlawful motive. The fact that a demand may have extra-unit effects does not alter its status as a mandatory subject of bargaining. See American Federation of Musicians of United States and Canada v. Carroll, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968);

Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); Local 24 of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A.F.L.–C.I.O. v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959). Cf. Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971).

We conclude from this record that in the Arizona negotiations petitioner unions did not insist that Phelps Dodge agree to terms and conditions of employment to be applicable generally to other bargaining units and that they did not strike to enforce such a demand.

The Board has advanced other union actions found to be violative of the Act. The trial examiner found that the unions had violated § 8(b) (3) of the Act by conditioning settlement of the Arizona negotiations upon approval by the Nonferrous Industry Conference and by refusing to execute the Arizona agreement after it was reduced to written form pending settlement at other bargaining units. The Board found that there was ample evidence to support the trial examiner's findings.

■ It is clear from the record that no actual delay occurred as the result of the submission of the agreement for the approval of the NIC. It is similarly clear from its decision and order that the Board was primarily concerned with an alleged attempt to unilaterally attack established bargaining units. Therefore, even assuming arguendo, that the union's submission of the agreement for NIC approval was violative of the Act, it was harmless violation.

Accordingly, the decision and order of the Board will be set aside and its cross-application for enforcement will be denied.