LK PRODUCTIONS, INC., Harry Lieberman, a/k/a Larry Kane, and Kane & Kompany, Plaintiffs,

v.

The AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS and the American Federation of Television and Radio Artists, Dallas-Fort Worth Local, Defendants.

Civ. A. No. 74–H–942.

United States District Court, S. D. Texas, Houston Division.

June 13, 1979.

Vinson & Elkins, Eleanor S. Glass and Harry Reasoner, Saccamanno, Clegg, Martin & Kipple, Charles Kipple, Houston, Tex., for plaintiffs.

Dixie, Wolf & Hall, Chris Dixie and Louise Gilmore, Houston, Tex., for defendants.

## MEMORANDUM OPINION RELATING TO ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

COWAN, District Judge.

*Introduction and Outline*

Defendants' Motion for Partial Summary Judgment seeks to eliminate the plaintiffs' antitrust allegations from this case. Defendants' motion seeks no relief from plaintiffs' cause of action based on alleged unfair labor practices in violation of the National Labor Relations Act. This memorandum will set out the reasons for the court's action in granting defendants' motion.

This memorandum opinion will:

I. Summarize the record (pp. 252 to 266);

II. Discuss the controlling authorities (pp. 266 to 273); and

III. Distinguish those authorities which are arguably applicable but not controlling (p. 273).

The issue here is not whether Kane has a cause of action of some type—the issue is whether he is entitled to *treble* damages and attorneys fees under the antitrust laws.

I.

### SUMMARY OF THE RECORD

*Record before the Court*

The record consists of the following documentary material and testimony: Deposition of Harry Lieberman, a/k/a Larry Kane, taken on January 30, 1976 (Kane deposition); Affidavit of Eleanor S. Glass, counsel for plaintiffs, authenticating min-

utes of the meeting of the Board of Directors of AFTRA Dallas-Fort Worth Local and additional significant correspondence relating to the matters in controversy (Glass affidavit); Affidavit of Harry Lieberman, a/k/a Larry Kane (hereinafter "Kane"), filed in this court on January 12, 1979 (Kane affidavit); Affidavit of Sanford R. Wolff, National Executive Secretary of defendant AFTRA; Defendants' Supplemental Answers to Plaintiffs' Second Request for Production of Documents, filed herein on January 3, 1979; transcript of a two-day hearing conducted before Administrative Law Judge Lloyd Buchanan, on January 8 and 9, 1974 (hereinafter "NLRB transcript"); Defendants' Answers to Plaintiffs' First Set of Interrogatories, filed on March 14, 1978, along with voluminous exhibits to the answers appearing in this record in a folder labeled "Attachments No. 28" and numbered 1–A et seq. (hereinafter "Defendants Answers"); and a detailed First Amended Complaint setting out the alleged antitrust cause of action.

### Nature of Defendants and Their Collective Bargaining Agreements

The nature of defendant AFTRA is established by Exh. 3 to Defendants Answers constituting the Articles of Agreement and Constitution of the American Federation of Television and Radio Artists (hereinafter referred to as the "AFTRA Constitution"). AFTRA is a voluntary association formed to advance and benefit ". . . all those connected with performances in the field of radio, television and phonograph recordings . . ." Among other things, its objectives are

. . . to protect and secure the rights of the above-described persons in their professional activities;

. . . to promulgate and carry into effect such policies as shall secure the united action of all members of the said professions for the common good;

. . . to assist such persons in securing just and equitable contracts, agreements, working conditions, and minimum compensation in their dealings with employers, producers, networks, stations, advertising agencies, sponsors, independent packagers, transcription companies, phonograph recording companies, agents, managers, impresarios, and others connected directly or indirectly with radio, television, or phonograph record business;

. . . to investigate the practices of such employers, producers, networks, stations, advertising agencies, sponsors, independent packagers, transcription companies, phonograph recording companies, agents, managers, impresarios, and others and to take united action to abolish unfair dealings or abuses or other conditions which are detrimental to persons engaged in the said professions;

. . . to bargain collectively on behalf of its members and to deal with employers, producers, networks, stations, advertising agencies, sponsors, independent packagers, transcription companies, phonograph recording companies, agents, managers, impresarios and others whose activities affect the members concerning grievances, standard contractual relations, minimum wages and conditions, and concerning all related and collateral abuses that may affect the welfare of the members.

Persons eligible for membership in AFTRA are:

Any person who has performed, or intends to perform, as an actor, singer, dancer, announcer, newsperson, narrator, commentator, lecturer, analyst, M.C., sound effects artist, graphic artist, manual artist, demonstrator, moderator, panel member, specialist, quiz person, disc jockey, sportscaster, specialty act, puppeteer, model, walk-on, extra or supernumerary in the fields of radio, television and phonograph recordings . . .

Article V of the AFTRA Constitution provides that:

No person shall become a member of the Association, or of any Local thereof, unless and until such person signs an application which shall substantially provide that such person agrees to be bound by the respective constitutions of the Associ-

ation and the Local and by such amendments thereto as may thereafter be lawfully made, and by any bylaws, rules, regulations and orders existing or thereafter lawfully enacted pursuant to such constitutions and any amendments thereto.

Article VIII of the AFTRA Constitution provides for the establishment of local unions whose constitutions and bylaws "shall be consistent with the constitution and bylaws of the Association approved by the National Board . . ."

Article XXII of the AFTRA Constitution provides that:

> The Association through its National Board may order the members of all Locals to refrain for a given time . . from working for, dealing with, or having any business or professional relations with, any one or more employers, producers, networks, stations, advertising agencies, sponsors, independent packagers, transcription companies, phonograph recording companies, agents, managers, impresarios or other persons connected with the radio or phonograph record business . . .

The remaining portions of Article XXII deal with certain limitations upon the exercise of this power and prescribe definite procedures which must be followed before such an order may be issued. Article XVIII of the AFTRA Constitution provides that:

> Any member who shall be guilty of an act, omission, or conduct which in the opinion of the Board is prejudicial to the welfare of the Association, or any of its Locals, or of any of its members, as such . . . may . . . be either fined, censored, suspended or expelled from membership.

Article XVIII of the AFTRA Constitution sets forth the relationship between AFTRA and its Locals, and provides in its pertinent parts:

> The relation of each Local to this Association is that of an organization accepting certain rights vested in this Association, and agreeing in consideration of the giving of said rights, to assume the obliga-

tion set forth in this Constitution; and the acceptance of rights hereunder by the several Locals, shall not be deemed, at this time, to create any partnership or joint venture between them.

Article XXV provides that any member who has or asserts a claim against the Association, or any of its Locals, must submit his dispute to compulsory arbitration.

The nature of the Dallas-Fort Worth Local is established by Exh. 3–A to Defendants' Answers, and constitutes the Articles of Agreement, Constitution and Bylaws of the Dallas-Fort Worth Local of the American Federation of Television and Radio Artists (hereinafter "AFTRA Local Constitution"). The AFTRA Local Constitution provides that all members becoming members of the Local shall be deemed members of the national Association and subject to its jurisdiction. (See Art. 3, Sec. 3 of the AFTRA Local Constitution).

The AFTRA Local Constitution repeats many of the provisions contained in the AFTRA Constitution, including the provision that every applicant for membership ". . . shall sign an application on such form as shall be prescribed by the Local Board which shall substantially provide that he agrees to be bound by the respective constitutions of the Federation and of the Dallas-Fort Worth Local . . ." (see Art. V, Sec. 1)

Article XII Sec. 1 of the AFTRA Local Constitution provides that:

> Subject to the approval of the National Board, the Local, through its Local Board, may order its members to refrain for a given time or until further order of the Local Board under specified conditions or in any manner whatsoever from working for, dealing with, or having any business or professional relations with any one or more employers, agents, managers, impresarios, or other persons connected with the radio, television or phonograph record business . . .

Article XX of the AFTRA Local Constitution also provides that unless the national Board grants an exemption, ". . . the exclusive remedy of any member who has

or asserts a claim against the Federation, any of its Locals, or other subdivisions . . ." shall be by a compulsory arbitration procedure.

### Collective Bargaining Agreements Negotiated By AFTRA

The collective bargaining agreements which AFTRA and its Locals negotiate with various ". . . employers, producers, networks, stations, advertising agencies, sponsors, independent packagers, transcription companies, phonograph recording companies, agents, managers, impresarios and others connected directly or indirectly with radio, television, phonograph record business . . ." are established by a number of the exhibits to Defendants' Answers. The AFTRA collective bargaining agreement applicable to the television industry is in the record as Exh. 6 to Defendants Answers. The pertinent parts are:

Paragraphs 1 through 74 basically set forth detailed rules concerning wages, hours and conditions of employment.

Paragraph 75 contains detailed provisions concerning "People Covered" and provides essentially that those persons covered are "All persons who perform as talent, e. g., Masters of Ceremonies, . . ."

Paragraph 78 entitled "Waivers" is significant. This paragraph plus the agreement which AFTRA Dallas-Fort Worth Local eventually worked out with Kane in December 1971 (see discussion, p. 262, *infra*) establish that nothing in the rules, procedures or customary practices of AF-TRA or AFTRA locals prevent them from bargaining separately with each employer group. The second paragraph of Paragraph 78 provides:

> The wages and working conditions set forth herein are the minimum wages and working conditions for the employment of television artists in the categories men-·tioned above and no waiver of any such wages or working conditions by any artist shall be effective unless the written consent of AFTRA to such waiver is first had and obtained.

Pursuant to the authority granted by this paragraph, AFTRA Dallas-Fort Worth Local (its action later confirmed by AF-TRA) agreed with Kane that during his formative period, while he was attempting to get his business on its feet, he was not required to pay union scale but was to pay only $50 per artist per performance and make a 6½% contribution to the AFTRA Pension and Welfare Fund. This provision is, it seems to the court, significant in the light of *Pennington, infra,* in that it demonstrates that defendants were not required to and did not here attempt to impose union scale upon those employers who were financially unable to pay.

Paragraph 84 entitled "Union Shop" contains the following significant provision:

> American Federation of Television and Radio Artists agrees that it is and will continue to be an open union and that it will keep its membership rolls open and will admit to membership all eligible television artists engaged by the producers. American Federation of Television and Radio Artists agrees not to impose unreasonable entrance fees or dues upon its members and wherever necessary for the producers' program purposes to qualify members within 24 hours after notice from the producer.

This provision is significant in view of the concern expressed in *Carroll, infra,* and *Allen Bradley, infra,* where the courts apparently believed it wise to deny a union the power to exclude a particular group of businessmen from a relevant market. In the context of this case, the union could never prevent a "top star" from appearing on the Larry Kane Show since such person would always have a virtually absolute right to become a union member.

Paragraph 92 of the collective bargaining agreement defines the situation in which a producer may be declared an "unfair producer."

Paragraph 93 contains a commitment that AFTRA will not strike any producer who performs in accordance with the Code.

Paragraph 95 sets up a detailed arbitration procedure to resolve controversies be-

tween any producer and AFTRA or between any producer and a member of AFTRA.

Paragraph 102 of the collective bargaining agreement relates to the detailed provisions with reference to the collection of funds for the AFTRA Pension & Welfare Fund.

The collective bargaining agreement, entitled "1969–1972 National Code of Fair Practice for Network Television Broadcasting" construed in conjunction with the AFTRA Constitution and the AFTRA Local Constitution, makes it clear that the union and the signatories of the collective bargaining agreement contemplated that the "employer group" would include

. . . employers, producers, networks, stations, advertising agencies, sponsors, independent packagers, transcription companies, phonograph recording companies, agents, managers, impresarios, and others connected directly or indirectly with the radio, television or phonograph record business . . .

The agreement contemplated that the "employee group" would include

. . . any person who has performed or intends to perform as an actor, singer, dancer, announcer, newsperson, narrator, commentator, lecturer, analyst, Master of Ceremonies, sound effects artists, graphic artists, manual artists, demonstrator, moderator, panel member, specialist, quiz person, disc jockey, sportscaster, specialty act, puppeteer, model, walk-on, extra, or supernumerary, in the field of radio, television and phonograph recordings . . .

Part of the key to this case is that some persons, like Larry Kane and Dick Clark, would be both "employees" and also part of the "employer group" similar to the orchestra leaders, whose activities were in issue in *American Federation of Musicians v. Carroll, infra,* pg. 260. A person like Larry Kane or Dick Clark, who was both an employer and a member of the "labor group," is also, in the undersigned's analysis, to some degree analogous to the truck driver who owns his own rig in *International*

*Brotherhood of Teamsters v. Oliver, infra,* pg. 266, and *California Dump Truck Owners Association v. Associated General Contractors,* 562 F.2d 607 (9th Cir. 1977).

The nature of the "employer group" is illustrated by Exh. 7 to Defendants Answers, listing literally hundreds of employers who have agreed to comply with one or another of the various AFTRA Codes. Examination of this exhibit reveals that members of the employer group include record companies, advertising agencies, charitable organizations such as the Lutheran Church; well-known entertainers who are also producers such as Ray Charles; political organizations such as various branches of the Democratic Party; the various political action committees such as the Committee to Elect Joseph Early to Congress and the Committee to Elect Judge Nicholas Tsoucalas; major corporate entities such as Cook Paint & Varnish Company through their advertising manager; the Ford Motor Company, Photo-Media Department. Examination of Exh. 7 also reveals that apparently AFTRA and the AFTRA Dallas Local have never been particularly active in organizing activities in the Houston area since very few of the signatories listed in Exh. 7 appear to be Houston-based companies. This fact is at least a partial explanation of why defendants exhibited little interest in Kane during the years when he operated his show locally as an employee of Channel 13.

*The Larry Kane Show and Its Demise*

In 1959 Kane, an ex-disc jockey and then a student at the University of Houston began to host the "Larry Kane Show" on KTRH–TV, Channel 13, a local Houston, Texas television station. Kane continued his endeavor for a decade as an employee of Channel 13.

Kane's program was successful and popular locally.

The basic concept of Kane's program was that for one or two hours on a Saturday afternoon, he would host what was essentially a party in the Channel 13 studio at which a number of teenagers would dance

to recorded music. In addition, during the course of the program, two or three "top stars" would appear in person, sing or otherwise perform, and then participate in an interview with Kane. Intervals for commercials were interspersed through the show.

Despite the simplicity of the concept, a fairly elaborate production staff was required to produce the show. It was necessary to have a director, an assistant director, a dance director, cameramen, make-up personnel and talent directors to schedule and care for the "top stars." Studio facilities were necessary.

Kane, while in charge of this entire operation, was himself a performer. The program typically commenced with Kane being introduced, thereafter participating in the first dance; this activity would normally be followed by a commercial break, and thereafter the first top star would be interviewed by Kane. Kane prepared for his performance by acquainting himself with the top star and determining what the top star wished to talk about during the interview. (See NLRB transcript, p. 227, et seq; and p. 274, et seq).

The concept of the Larry Kane Show is not unique. Similar shows have appeared in Chicago, Los Angeles, Nashville and in other markets. Sanford Wolff, National Executive Secretary and the chief executive officer of AFTRA, has testified, without contradiction, that Kane-type shows produced in Chicago, Los Angeles, Nashville and others of which he had knowledge, were produced under AFTRA collective bargaining agreements in which recording artists were paid for performing services on the programs. (NLRB transcript pp. 307–315). Probably the best known of these shows is Dick Clark's "American Bandstand" program.

While Mr. Wolff testified before the NLRB hearing (see NLRB transcript p. 315, et seq) that shows like the Larry Kane Show were customarily produced with the producer paying union scale, it is inferable from certain of Mr. Wolff's correspondence (see letter, *infra,* p. 261) and from the fact that Kane was able to continue to obtain "top stars" even after he was placed on the unfair list that both AFTRA and the American Federation of Musicians have had considerable difficulty in persuading their own members to refrain voluntarily from working on record promotion shows like the Larry Kane Show. This inference could also arise from the fact that the AFTRA Dallas Local was obviously very reluctant to undertake the chore of persuading Kane to sign a "letter of adherence" and pay union scale to the top stars who appeared on his show.

During the decade from 1959 to 1969, while Kane was an employee of Channel 13 and acting as host of the Larry Kane Show, he devised a method of obtaining the services of the "top stars" without making a monetary payment to the top stars. As a general rule, each of the "top stars" was attempting to promote a record or his own career. Many "top stars" were willing to appear on the Kane show simply for the public exposure which they received. Generally, Channel 13 would pay only for the performer's lodging and ground transportation while in the Houston area. Kane would normally arrange for the appearance of the "top stars" through the star's agent, or through a record company with which the star had a contract.

During the actual performance, Kane exercised little detailed control over the manner in which the star performed. For example, Kane did not tell the star what to sing or how to sing, or prescribe his costume. Administrative Law Judge Buchanan accurately observed that Kane would not demand that Al Jolson refrain from singing on his knees. On the other hand, Kane did control totally the environment in which the star performed in the sense of controlling the teenaged dancers, the cameramen, directors, dancing coordinators, and the time allotted to the "top stars." Administrative Law Judge Buchanan, who conducted the detailed hearing described above, has found that the "top stars" had the legal status of independent contractors.

For purposes of this motion, it must be assumed that the "top stars" did in fact have the legal status of independent contractors. It is apparent, however, that they were "independent contractors" of a specialized variety. The manner in which they performed their function was certainly considerably different from the manner in which an independent contractor in the construction business performs his work. Additionally, Kane, while his corporation ultimately became an "employer" of some of the personnel putting on his show, was also always a performer. He actively participated in and was a vital part of the entire show.

On occasion, a star's agent or the record company with whom Kane was dealing would ask whether or not Kane paid the union scale. Kane would reply that he did not. Significantly, Kane has testified on his deposition that his basic plan throughout the entire period of his syndication was that the performers would be paid nothing. (Kane deposition pp. 66–68). Despite this plan, however, as will be shown at a later point in this narrative, Kane did ultimately agree to pay the performers. (See discussion of meeting of December 1971, *infra,* p. 262).

In 1969 and 1970, Kane because restive in his relationship with Channel 13. In March of 1969, Kane formed a corporation, LK Productions, Inc., one of the plaintiffs herein, for the purpose of syndicating the Larry Kane Show. By "syndication" in this context is meant that the Kane show would be taped and an effort made to market the tapes to television stations or other possible purchasers located in other areas of the country.

Contemporaneously with Kane's formation of LK Productions, Inc., or shortly thereafter, the management of Channel 13 changed. The new management of Channel 13 was not enthusiastic about Kane's plans to syndicate his show and attempted to persuade him to continue to produce the show locally as he had done successfully over the last ten years. Kane was unwilling to accept this advice and continued with his plans to syndicate his show.

Eventually Kane terminated his employer/employee relationship with Channel 13 and intensified his efforts to syndicate his show. Initially he continued to produce the show at Channel 13 but became dissatisfied with the charges which Channel 13 levied upon him for the use of its facilities, and thus he moved his office close to an entity known as Mobile Color, Inc., where he was able to continue to produce his shows. At the time he moved from Channel 13, Kane also entered a business relationship with an entity known as Bing Crosby Productions, later Tele-Com (hereinafter "Crosby/Tele-Com").

Kane's arrangement with Crosby/Tele-Com was that Crosby/Tele-Com was to syndicate Kane's show nationally on a "barter" basis. A show is syndicated on a barter basis by making arrangements with networks and local television stations to use the syndicated show, without charge. The syndicator, however reserves the right to sell to advertisers some of the time which has been reserved during the shows.

Kane's relationship with Crosby/Tele-Com, which extended from the time Kane left Channel 13 in 1970 until Kane terminated with Crosby/Tele-Com in August of 1971, was ultimately unhappy.

Kane testifies that Crosby/Tele-Com did an excellent job of placing his show with non-paying stations in various markets, but did not succeed in selling the advertising spaces or obtaining sponsors. In this connection, some of Kane's regular advertisers during the period that he was an employee of Channel 13 were Gordon's Jewelry, Texas State Optical, and O. J. Beauty Lotion. All of these advertisers are local or regional advertisers. These advertisers remained with him when he established his relationship with Crosby/Tele-Com. The only additional substantial advertiser that Crosby/Tele-Com was ever able to obtain was Vicks, for their product Clearasil. This relationship with Vicks terminated in June 1971.

By January 1971, Crosby/Tele-Com had been successful in "placing" Kane's show on

non-paying television stations in over 25 states. The only problem was that Crosby/Tele-Com was unsuccessful in selling the advertising spots, or obtaining "sponsors" for the Larry Kane Show. The television stations paid nothing for the use of the Kane show under the arrangement with Crosby/Tele-Com.

During the decade when Kane was an employee of Channel 13 and was producing the Larry Kane Show locally, none of the defendants exhibited any interest in him, possibly because the Houston area has apparently never been actively or extensively organized by defendants. That disinterest changed in 1971 when Kane's show began to be aired in Los Angeles, New York and other areas in which there were strong and active local AFTRA chapters.

A detailed understanding of events which occurred from the spring of 1971 until the fall of 1972 may be obtained from correspondence which appears in this record appended to the affidavit of Eleanor S. Glass, and also appended as exhibits to "Defendants Answers." The parties to this detailed correspondence are John Kunsak, Jr., a/k/a "Johnny K," a/k/a "Johnny," the Executive Secretary of the AFTRA Dallas-Fort Worth local; David Tytherleigh, Executive Secretary of the AFTRA Los Angeles Local; Sanford Wolff, Executive Secretary of AFTRA National; Claude McCue, Executive Secretary of AFTRA Los Angeles Local; and Sharon Mayhew, an employee and representative of the Dallas-Fort Worth Local.

The record (Eleanor Glass affidavit, Exh. I–A) contains a copy of a letter from David O. Tytherleigh, Assistant Executive Secretary of the Los Angeles Local, to Sanford Wolff, the National Executive Secretary, advising that the Larry Kane Show was to be shown at Station KTLA in Los Angeles on April 24, 1971. Wolff was advised that the program was made available free on a barter deal by the distributor, Tele-Com Productions. Tytherleigh concludes his letter to Wolff by stating:

I realize how difficult it is to control these record promotion shows. . . .

It is a fair inference that the AFTRA Dallas-Fort Worth Local, in response to pressure from Wolff, began efforts to persuade Kane to pay the union scale to "top stars." In the spring or summer of 1971 Kunsak told Kane that AFTRA and its Dallas-Fort Worth Local would place his show on the unfair list and cut off the supply of entertainers if Kane did not sign a "letter of adherence." Letters of adherence are described in Paragraph 89(a) of the 1969–1972 National Code of Fair Practice for Network Television Broadcasting (see Exh. 6 to Defendants Answers). The signer of a letter of adherence basically acknowledges receipt of a number of AFTRA codes, and agrees to abide by and conform to the codes, which prescribe wages, hours and terms of employment. The signer of the letter of adherence also agrees to the arbitration provisions of the various codes and agrees to make contributions to the AFTRA Pension & Welfare Fund according to the AFTRA Pension & Welfare Fund's Agreement and Declaration of Trust, dated November 16, 1954.

A "letter of adherence" is visualized more accurately by examination of Exh. 6(a) to Defendants Answers; it is the type of letter agreement which AFTRA and its locals attempt to obtain from producers like Kane, in which Kane in effect acknowledges receipt of the national code and agrees to be bound by the terms and provisions of the code, except as modified in any supplemental letter agreements.

In addition to the collective bargaining agreement entitled "1969–1972 National Code of Fair Practice for Network Television Broadcasting" which obviously covers television broadcasting, AFTRA also promulgated and attempted to negotiate adherence to codes of fair practice for commercial radio broadcasting (see Exh. 6 to Defendants Answers) for radio recorded commercials, or television recorded commercials, and for radio transcribed commercials.

Also illustrative of a typical "letter of adherence" is Exh. 83 to Defendants Answers, entitled "Screen Actors Guild American Federation of Television and Radio Art-

ists Texas Local and Regional Contract Letters of Adherence." This letter of adherence is similar to that set out in the collective bargaining agreement itself and states that the "producer/advertising agency signatory . . ." acknowledges receipt of the American Federation of Television and Radio Artists Code of Fair Practice for Transcriptions for Broadcast Purposes, and the 1969–1972 AFTRA National Code of Fair Practice for Recorded Commercials for Television Broadcasting Purposes, and agrees to comply with the terms and conditions of said documents and also sets out certain rates for appearances on commercials which are applicable in Texas, Arkansas, Oklahoma, Louisiana and New Mexico areas. See also Exh. 8(a)(10) to the Defendants Answers to illustrate a typical form of letter of adherence.

The inference could be drawn from the record, and in fact it may be established almost conclusively that the reluctant AFTRA Dallas-Fort Worth Local responded to pressures from the Los Angeles Local and that the Los Angeles Local succeeded in enlisting Mr. Wolff of the National Association in encouraging the AFTRA Dallas-Fort Worth Local to take action against Kane. It could also be fairly inferred that the Dallas Local was motivated by complaints from Dick Clark, who paid union scale and was the signatory to an AFTRA letter of adherence. While the record contains no detailed information concerning Clark's operation, it is undisputed in the evidence that Clark's operation was basically similar to that of Kane's. This is important because Clark, being a performer himself, was clearly not an "employer group." (See *American Federation of Musicians v. Carroll*, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), and *International Brotherhood of Teamsters v. Oliver, infra.*)

The record is unclear as to what response Kane made to Kunsak's demands, but the record does establish that in the summer of 1971, Kane himself became a member of AFTRA (NLRB transcript p. 240). Kane was still a member of AFTRA at the time of his testimony before Administrative Law Judge Buchanan in January of 1973.

Kane's application for membership in AFTRA is not before the court; however, the AFTRA Articles of Agreement and Constitution are before the Court (Defendants Answers Exh. 3). Article V of the AFTRA Constitution provides that "No person shall become a member of the Association, or of any Local thereof, unless and until . . ." such person executes an application agreeing to abide by the constitution, bylaws, rules, regulations and orders of AFTRA and its locals.

In August of 1971, Kane terminated his relationship with Crosby/Tele-Com. Kane has testified that the reason for this termination was that Crosby/Tele-Com had failed to make accurate and detailed accountings of the moneys due Kane and because Crosby/Tele-Com had obtained only one national advertiser, Vicks, and the relationship with Vicks had terminated the previous June. Kane determined in August 1971 that he was going to syndicate his own show and was going to make his own efforts to sell the show to various markets and to obtain advertisers. He was hindered in this connection, however, because Kane and LK Productions, Inc. did not have sufficient funds to enable its sales personnel to travel. Kane also determined that he was no longer going to market his show on a "barter" basis but was going to demand payment from a television station before furnishing his product.

In August of 1971, LK Productions, Inc. "went into reruns." A television show goes into reruns when it ceases producing shows regularly and begins to show again those shows which have been previously performed and taped. Kane testifies that following the severance of his ties with Crosby/Tele-Com in August 1971, he had a sequence of 18 simultaneous reruns, which caused remaining sponsors to become very concerned. (Kane deposition, p. 54).

Kane's strained financial circumstances and the nature of his conversations with AFTRA Dallas Local representatives during the summer of 1971 is further illustrated by Sharon Mayhew's letter of August 9,

1971 to David Tytherleigh of the Los Angeles Local. Sharon Mayhew was a representative of the Dallas Local. Mayhew's letter of August 9 reports that Kane had told Kunsak (another representative of the Dallas local) that Crosby/Tele-Com had advanced Kane $10,000 and was dunning him for repayment and that Kane's principal objection to paying scale was that he simply had no money. Mayhew reported to Tytherleigh that:

> The gist of the matter, however, is that Kane has no money to pay performers because TCP has not paid him; that TCP is dunning him for repayment of an "advance"; that performers have all agreed to do the show strictly for the promotion aspect.

(TCP is Tele-Com Productions, herein called Crosby/Tele-Com). (See Exh. 13 to Defendants Answers).

Tytherleigh's letter to Mayhew of August 12, 1971 (Exh. 13 to Defendants Answers) reveals that Tytherleigh was not impressed with Kane's financial difficulties and that he insisted that so long as Kane continued to produce shows, he should be a required signatory to the AFTRA network TV code.

During August, October and November of 1971, the Larry Kane Show was still being seen in a number of states, although Kane was not being adequately compensated because of the failure of Crosby/Tele-Com to obtain sponsors. Both AFTRA and the Los Angeles Local continued to encourage the Dallas-Fort Worth Local to take more vigorous action toward obtaining what they regarded as compliance from Kane. The record (Eleanor Glass affidavit Exh. II) contains a letter from Mr. Tytherleigh of the Los Angeles Local to the Dallas-Fort Worth Local, stating:

> Thank you for your letter of August 9, 1971 together with the enclosures thereto. If Larry Kane made a bad deal with TCP, AFTRA, so far as I know, is in no position to collect his money for him as a producer. Herb Neuer, being in Chicago where TCP is located, is in a better position to know if there is any lever to be used. In the meanwhile, Kane continues

to produce shows and is not a signatory to the AFTRA Network TV Code, which covers syndicated shows such as his. It is my feeling that there is no alternative but to have the Dallas Local Board of Directors request the National Board to declare his company and Larry Kane as an individual 'unfair,' and for AFTRA to so notify its members thereafter ordering them not to perform services for or on behalf of Larry Kane or LK Productions. When work is performed that is applicable to one of the national codes and when the result of such production is exhibited in other cities, it is not the prerogative of the Local where the production occurs to waive compliance with the applicable Code. At least that is what I have always understood to be the rule.

One possible inference from this letter is that Kane had joined AFTRA in the hope that AFTRA would aid him in his continuing controversy with Crosby/Tele-Com. Another possible inference is that the defendants were attempting to place Kane in a better financial position by assisting him in his controversy with Crosby/Tele-Com.

On October 5, 1971, Tytherleigh of the Los Angeles Local wrote another letter to the Dallas-Fort Worth Local inquiring what action was to be taken with reference to Kane and encouraging the Dallas-Fort Worth Local to take action to declare Kane "unfair." (See Eleanor Glass affidavit Exh. III).

On October 28, 1971, Claude McCue, the Executive Secretary of the Los Angeles Local, directed another letter to the Dallas Local complaining about Kane and the failure of the Dallas Local to take some action with reference to Kane. In response to this letter, a copy of which went to Sanford Wolff, National Executive Secretary, Mr. Wolff responded to the Los Angeles Local, with copies to the Dallas-Fort Worth Local, in a letter containing the following language:

> Dear Claude:
>
> By copy of this letter John Kunsak will know that I agree with your strong recommendations and I hope that the action

recommended by you is taken by the Dallas Local Board on November 8th.

I think that out of Johnny's letter comes one thought that should give us significant pause. I believe that we need a strong rule with regard to members working on programs that are non-signatories and concerning which fees are not paid. This afternoon I will discuss such a rule with Morty Becker and hopefully prepare something for presentation at our Board Meeting on November 9th. This will have to be a rule, put on deferred agenda and brought before all three sections of the Board. It will have to be well publicized and promulgated by all locals and I guess that a real campaign for its enforcement will have to be made in New York, Chicago, Los Angeles and Nashville. It will be the kind of rule that the musicians' union has in the past successfully promulgated and enforced even though it has caused that Union a great deal of difficulty. Our members must realize that appearances on tape programs which are then going to be syndicated is doing nothing but eating away the limited number of hours during which live performers are working on television.

I would like to start a campaign immediately after November 16th amongst all locals, members and franchised agents and in any instance in which an agent books one of our people with a non-signatory I am going to ask Morty to take action to. revoke the franchise. I am tired of hearing this stuff about pushing records and pushing books and otherwise appearing free so as to promote some individual's career.

It is significant, it seems to the writer, that while it can be demonstrated persuasively that considerable pressure was placed upon the Dallas-Fort Worth Local, the pressure was all from other AFTRA locals, and not from "employer groups." This entire record is devoid of any indication that any "employer group" had any interest whatsoever in eliminating Kane as a competitor.

In December of 1971, AFTRA Dallas Local, finally stirred to action by the continual correspondence from AFTRA and the Los Angeles Local, invited or urged Kane to attend a meeting of the Dallas board. This meeting is documented by detailed minutes which are introduced into this record through the Eleanor Glass affidavit. These minutes, the accuracy of which is not disputed, described the portion of the meeting relating to Kane as follows:

*LARRY KANE PRODUCTIONS*

The next guest to appear before the Board was Larry Kane of Larry Kane Productions, Inc. The reason for his appearance was to decide what to do about the pressure from both Coasts to put Mr. Kane on the unfair list for not paying scale. Mr. Kane explained the problems that he has had and is still having with the show, mainly due to the failure of Tele-Com to come through with the money as per the contract.

Mr. Kane is now in the process of withdrawing his show from all current markets. Mr. Kane stated that his main problem was in not knowing the difference in syndication and network shows. He was never asked by any performer on his show for scale. All performers appear to plug something . . . a book, a record, or a movie. Mr. Kane currently has a suit against Tele-Com to get the money owed.

The markets on which his show is now running are all on a barter basis, set up by Tele-Com. He has no money coming in from the show, and has received no money before now.

His plans are to re-call all the shows and then offer them to paying markets only. All shows currently running on a barter basis will be off the air by January 1. After then, only the stations who will pay for the show will receive it. Mr. Kane currently has enough shows taped to last until January 1. His show is on once a week.

Larry asked the Board to help him work out an arrangement whereby he could stay on the air, because he would be able

to pay the performers after his show goes on a paying basis.

A discussion was held on regional rates, etc. Mr. Kane was asked if he would be willing to sign a regional Letter of Adherence. He said that he would, and he would know within a month what the future of this show will be . . . whether to go ahead with it or just forget it. The Board decided to set a temporary regional rate that Mr. Kane can live with for 30 days until he can see what the future is.

A motion was made that the Larry Kane Productions, Inc. will pay single performance $50.00 per performance per show; $100.00 for a group per show, one performance, effective January 1, 1972, for a period of 30 days, subject to ratification by National AFTRA. This approval of the Dallas/Fort Worth AFTRA Local. Motion carried unanimously.

Said motion was acceptable to Mr. Kane. Also, it was agreed that an additional 6½% of that fee will be paid for each performer to the AFTRA Pension and Welfare Fund.

Mr. Kane stated that there was a chance he would have at least one major market—Philadelphia—and it is understood that the above rates are only for this five state region. A new agreement will be negotiated with Mr. Kane and Larry Kane Productions, Inc. every thirty days to re-evaluate the situation. The agreement from January 1 to February 1 will be negotiated on January 15, 1972.

Kane testifies that the agreement documented by the minutes of the meeting of December 13, 1971 was acceptable to him at that time. (Kane testimony before NLRB, pp. 287–8). Shortly thereafter he received a telephone call from Kunsak, the representative of the Dallas Local, who advised him that AFTRA had agreed to the plan set forth in the minutes of the meeting of December 13, 1971.

It is significant, in light of *Pennington, infra,* that defendant unions did not rigidly insist upon Kane paying exactly the same wages paid by other similar producers. According to the undisputed evidence, the defendants and Kane worked out an arrangement which was then acceptable to Kane.

One of the key facts in this pattern is that (according to the undisputed evidence) Kane later simply decided that he would not or could not comply with the agreement that he had made with the AFTRA Dallas-Fort Worth Local in December 1971. At some undetermined time between December 1971 and March 1972, Kane again discussed the situation with Kunsak, the representative of the Dallas Local, and told Kunsak that since Kane was not producing shows, it would be superfluous to discuss additional agreements or to discuss performance of the agreement made at the December 1971 meeting.

In March of 1972, events occurred which, according to Kane's view of the facts, dramatically improved Kane's prospects for creating a successful enterprise. It is undisputed that the period from the time of Kane's severance of relations with Crosby/Tele-Com until March 1972 had been a very discouraging period. Kane, apparently because of financial pressures, had stopped production of shows and was selling only reruns. Two of his sponsors who had been faithful to him over the years were disturbed by the reruns and either dropped their sponsorship or were on the verge of doing so. Kane had taken the position with the Dallas Local, through Mr. Kunsak, at some time between December 13, 1971 and March 2, 1972, that because of the fact that he was not producing, he could not pay even the $50 per performance per artist which he had agreed with the Dallas Local to pay.

In March 1972, Kane made a new agreement with Channel 2, another local television station. According to his arrangement with Channel 2, Kane was allowed to use Channel 2's production facilities. Channel 2 made no charge to Kane and LK Productions, Inc. for the use of its production facilities, but entered an agreement with Kane that Channel 2 would enjoy 10% of LK Productions' gross revenues in return for the use of its production facilities.

In March of 1972, Kane again talked with Kunsak and advised that he was prepared to resume production of the show on March 25, 1972 and offered to pay Pension & Welfare Fund contributions. Kunsak informed Kane that paying the pension fund contributions would not be satisfactory but that he, Kunsak, would still like to work out a satisfactory overall agreement (NLRB transcript, p. 288–289). It seems to the undersigned to be established conclusively, and as a matter of law, that Kane was withdrawing from and refusing to perform the agreement he had previously made in December of 1971.

Kane's situation in March of 1972, and his position with reference to the agreement which he had previously made in December 1971, is set forth graphically and without substantial dispute, in Kane's letter to Kunsak of March 6, 1972, copied verbatim:

> As we agreed, I am apprising you that we plan to resume production of the Kane Show on March 25, 1972 under a special arrangement with KPRC–TV wherein our production costs are reduced substantially. If such arrangement were not available to us, there would be no way we could begin producing the show at this time.
>
> I have attached a copy of our current market list, which vividly reflects the type of bleak position in which we presently exist. The only positive steps accomplished have been reduction of production expense, dropping non-revenue producing stations, and launching an all-out attempt to try earning our way out of debt. Operating efficiently and taking a hard line on overhead, we can work out of this. All the assistance that you can offer will make a vast difference in our success or failure. It is perfectly obvious that, with the attached market list, we are in business by the skin of our teeth and in no position to be paying scale to performers. Even the reduced scale appears momentous at this stage. The P & W is realistically all that I feel we can handle; and I ask that you consider our present position and the task that we have undertaken. Naturally, we plan to increase this market list. We must in order to progress. However, this time, if the list increases, so must our revenue and eventually our ability to pay performers. Until such time as our revenues are meaningful, we are strictly treading water for survival. I assure you that these past few months of consecutive reruns have done us no good, and we have a tremendous rebuilding process ahead.
>
> Since we have no information or appropriate forms in our files covering the P & W payments for performers, I will appreciate your sending some down with any pertinent information as to the exact procedure we are to follow in filing these. Whatever procedure is to be settled upon, I want to be certain that our office is well aware and equipped to handle it.
>
> Also, please advise me of my present membership status, and requirements for the insurance coverage.
>
> Thanks again, John, and I look forward to your reply, and hopefully to your full cooperation as we fight the setbacks and work out of this dilemma. Right down the line, we have been 100% factual with you, and we obviously need your reciprocal assistance until we are healthier.

Kunsak wrote Sanford Wolff, the National Executive Secretary on March 14, 1972 in effect urging Wolff to accept Kane's proposition. AFTRA National was unable and unwilling to agree to Kane's new proposition, and thus eventually Kane was placed upon the unfair list in July of 1972.

The action of AFTRA and AFTRA Locals in placing Kane on the unfair list obviously did not absolutely prevent Kane from obtaining "top stars." On October 6, 1972, Kunsak wrote Claude McCue, Executive Secretary of the Los Angeles Local, that on August 5, 1972, Mike Murphy, member of the New York Local, Rick Springfield who records for Capitol Records, the Gary Lewis Group, Neil Sedow and Messrs. Boatman, Rosenthrow and Ramsey had all appeared live on the Larry Kane Show.

On various other dates in August and September, according to Kunsak's letter,

other AFTRA members appeared on Kane's show. (See Exh. 24–1 to Defendants Answers).

It should be recalled that Kane normally had three performers on each of his shows. The performance of the agreement which he had made in December 1971 would thus cost Kane $150 per show plus 6½% of that sum for contribution to the AFTRA Pension & Welfare Fund. While there is no direct evidence in the record concerning the cost of producing one show, it is apparent from the testimony concerning the number of personnel required to produce the show and the obvious costs of the production equipment required, that $150 per show was a very nominal addition to the total expense of producing a show of this nature.

This court is fully aware of the fact that in deciding a motion for summary judgment, it cannot make decisions concerning disputed facts; however, the undersigned believes that no reasonable juror could ever believe that Kane's ultimate financial failure was caused by the union's demand that he pay something in the range of $50 per performance to the "top stars" who appeared on his show. The undersigned is totally persuaded (and persuaded to the point where this court is willing to hold as a matter of law) that Kane's ultimate difficulties with the union in 1972, and his being placed on the unfair list, were the result of his unexplained refusal to perform the agreement he had made in December 1971, and not to any violation of the antitrust laws.

Kane has testified about this set of circumstances twice. He has executed and filed an affidavit setting out matters which he apparently feels are helpful to his cause. In his testimony and his affidavit, Kane does not explain or state that following his March 1972 contact with Kunsak he ever attempted again to work out any form of accommodation with the union except for the letter of March 6, 1972 which is an obvious repudiation of the agreement made in December 1971. His conduct is consistent with his testimony upon his disposition in which he testified that his basic plan and intent throughout was to avoid making any payments to the "top stars" because he did not feel that any payments were justified. (See Kane deposition, p. 65–66).

Kane contends that his ultimate lack of success in his arrangement with Channel 2 was caused by the union activities; however, Kane was able to operate during March, April, May, June and July, of 1972 with no union interference whatever because the union did not actually place him on its "unfair list" until July 21, 1972.

There is no evidence in the record as to how many shows were actually produced after March 28, 1972 or concerning Kane's success or lack of success in marketing those shows or the advertising spots on such shows.

On September 11, 1972 the Board of Directors of the Dallas-Fort Worth Local met and their minutes (See Exh. 14(a)–2 of Defendants Answers) contained the following notation:

> Johnny K. informed the Board that as per communication from Morty Becker, attorney for AFTRA, the following action should be taken and that he had followed the instructions. Larry Kane was notified by 'registered letter' of his rights to appear on his own behalf (sic) represented by counsel to explain his actions in appearing on the Larry Kane Show following notification that the show had been placed on the 'unfair' list by the National Board. Mr. Kane did not appear at this time nor did he appear later in the evening, but Carter Smith reported that he had personally observed an audeo-tape (sic) recorded by Mr. Kane's appearance on at least three shows since the National Board action. Action on the matter was delayed to give Mr. Kane sufficient time to appear at the meeting and the business of the Board moved to another item on the agenda.

This entire history of this matter would justify an inference that after Kane made his agreement with the AFTRA representative in December 1971, he thereafter simply decided to ignore his agreement and his commitments as an AFTRA member.

The minutes of the meeting of September 11, 1972 also reflect some details concerning AFTRA Dallas Local's efforts to organize in the Houston area. These efforts were apparently meeting with only limited, if any success. After a discussion of the organizing activities in the Houston area, the minutes contain the following notation:

Carter then mentioned that at this time Larry Kane had still not arrived to appear before the Board and that appropriate action needed to be taken. Johnny Kunsak said that we must inform Kane that he is being suspended and is being fined for each performance on his show since August 5. At the last meeting Annabelle Weenick had moved that he be fined the rate for his type of show—$185 per show. Such fine will continue to accrue for all future appearances.

In 1972, Kane, as the charging party, filed two complaints with the National Labor Relations Board. These complaints proceeded to hearing before the Honorable Lloyd Buchanan, Administrative Law Judge on January 8 and 9, 1972.

On November 7, 1972 AFTRA Los Angeles Local gave notice to all entities who had previously been notified that Kane was on the unfair list, that AFTRA would not do anything to interfere with the employment of any AFTRA artist on the Larry Kane Show during the pendency of NLRB Cases Nos. 23–CC–463 and 23–CC–467.

In October of 1973, Judge Buchanan rendered his decision, finding that the "top stars" were independent contractors, and for that reason AFTRA and the AFTRA locals had committed an unfair labor practice. Thereafter the National Labor Relations Board obtained an injunction, to which the AFTRA entities agreed, prohibiting the retention of Kane and his companies upon the "unfair list." This injunction was entered in October of 1973.

In the spring and summer of 1972, Kane formed a joint enterprise with Leroy Golger, and they together produced a number of taped shows which they attempted to market. Their efforts to market these shows was not successful, and Kane con-

tends that the lingering effects of his "unfair" listing was responsible for his inability to market these shows.

The earlier "unfair" listing did not inhibit Kane's efforts to obtain performers for the Golger shows, and it is thus difficult to perceive how an "unfair listing" which had been removed and which the defendants had been enjoined from enforcing, would have had any inhibiting effect upon the sale of these programs; nevertheless, it is conceivable that this would be a fact issue which this court cannot decide.

As this court views the facts, however, the entire Golger enterprise is essentially immaterial. The Golger enterprise occurred long after the conduct which is complained of in this case. If the union's conduct did not fall within the ambit of the antitrust law, then later damages stemming from that conduct may provide the plaintiff some basis for damages under the labor laws, but cannot provide the basis for treble damages under the antitrust laws.

II.

ANALYSIS OF CONTROLLING
AUTHORITIES

This case is controlled by the following authorities: *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *Milk Wagon Drivers' Union v. Lake Valley Farm Products*, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940); *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941); *Local Union 189 Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); *International Brotherhood of Teamsters v. Oliver*, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959); *American Federation of Musicians v. Carroll*, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968); *Hunt v. Crumboch*, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945); *California Dump Truck Owners Assn. v. Associated General Contractors of America*, 562 F.2d 607 (9th Cir. 1977); Dissents by Justice Brandeis in *Duplex Printing Co. v. Deering*, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1924); *Bedford Cut*

*Stone Co. v. Journeymen Stone Cutters' Assn.*, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916 (1927).

*Apex Hosiery v. Leader, supra*, was an effort to recover treble damages from a union and its officers for damages incurred during a violent sitdown strike at the Apex Hosiery factory. The facts bear no resemblance to the case at bar, but *Apex* teaches the following relevant lessons:

1. The mere fact that union conduct may violate established law (in that case state laws against trespass and willful destruction of property) does not justify a conclusion that the union conduct violated the antitrust laws;

2. The Sherman Act is not applicable unless the facts present ". . . some form of restraint upon commercial competition in the marketing of goods or services . . ." 310 U.S. at 495, 60 S.Ct. at 993.

3. In analyzing all of the pre-1940 cases involving the conflict between the antitrust laws and those Congressional enactments to labor policy, Justice Stone said at 310 U.S. 469, at 500, 60 S.Ct. 982 at 996:

> In the cases considered by this Court since the *Standard Oil* case of 1911 some form of restraint of commercial competition has been the sine qua non to the condemnation of contracts, combinations or conspiracies under the Sherman Act, and in general restraints upon competition have been condemned only when their purpose or effect was to raise or fix the market price.

Justice Stone's opinion goes on to point out that the anti-trust laws were not applicable to the conduct involved in *Apex* because it was plain that the strike did not have as its purpose restraint in competition in the market for Apex's goods.

Similarly in the case at bar, the union's challenged conduct did not prevent Kane from competing in any market, but merely required that if he was to compete, he must pay those sums to the performers which he had agreed to pay in his meeting in December of 1971.

In focusing upon the fact that any successful union activity to some degree acts as a restraint upon competition, Justice Stone said:

> A combination of employees necessarily restrains competition among themselves in the sale of their services to the employer; yet such a combination was not considered an illegal restraint of trade at common law when the Sherman Act was adopted, either because it was not thought to be unreasonable or because it was not deemed a "restraint of trade." Since the enactment of the declaration in § 6 of the Clayton Act that 'the labor of a human being is not a commodity or article of commerce * * * nor shall such [labor] organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws', it would seem plain that restraints on the sale of the employee's services to the employer, however much they curtail the competition among employees, are not in themselves combinations or conspiracies in restraint of trade or commerce under the Sherman Act.

> Strikes or agreements to not work, entered into by laborers to compel employers to yield to their demands, may restrict to some extent the power of employers who are parties to the dispute to compete in the market with those not subject to such demands. But under the doctrine applied to non-labor cases, the mere fact of such restrictions on competition does not in itself bring the parties to the agreement within the condemnation of the Sherman Act. . . . Furthermore, successful union activity, as for example consummation of a wage agreement with employers, may have some influence on price competition by eliminating that part of such competition which is based on differences in labor standards. Since, in order to render a labor combination effective it must eliminate the competition from non-union made goods, . . . an elimination of price competition based on differences in labor stan-

dards is the objective of any national labor organization. But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act.

It is significant that no one in the current case was trying to eliminate Kane as a competitor. Persons like Dick Clark, and the union officials who responded to urgings from him, were attempting to create a situation in which if Kane competed in the markets in which they operated, Kane would be required to make some payment to the "top stars" and make contributions to the AFTRA pension fund. The only competition which this would eliminate, however, would be "price competition based on differences in labor standards . . ." Elimination of price competition based on differences in labor standards does not give rise (according to the language of *Apex v. Leader*) to a cause of action under the antitrust laws.

*Milk Wagon Drivers Union v. Lake Valley Farm Products, supra,* (like the case at bar) involved a secondary boycott and was the first Supreme Court case (with the possible exception of the *New Negro Alliance* [*New Negro Alliance v. Sanitary Grocery Co.,* 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012] case) in which the Supreme Court gave effect to the Norris-LaGuardia Act. Defendant was an AF of L union which had for many years represented Chicago milkmen. Before the advent of the Great Depression the normal method of distributing milk in Chicago was that the various dairies which produced milk would own their own wagons, which they operated through employees, who became members of the defendant Milk Wagon Drivers Union.

During the depression, in response to the economic pressures of that era, a number of dairies attempted to devise means of underselling the established dairies, and for this purpose commenced the sale of their milk to independent contractors, called "vendors" who in turn resold the milk to retail establishments called "cut-rate stores" which then proceeded to undersell conventional dairies. This competition gravely injured the conventional dairies causing them to lay off many of the members of the defendant union.

Defendant union and its members began to picket the "cut-rate stores." The cut-rate stores then sued to enjoin the continued picketing.

Justice Black held that the trial court properly refused to enjoin the picketing because of the provisions of the Norris-LaGuardia Act and because the dispute in question properly involved a "labor dispute" within the meaning of the Norris-LaGuardia Act, 29 U.S.C. § 101–115.

In *Milk Wagon Drivers Union v. Lake Valley Farm Products, supra* and in *United States v. Hutcheson,* 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), Justices Black and Frankfurter explained in detail the history of the Clayton and Norris-LaGuardia Acts. In this connection, Justice Black said:

> The Norris-LaGuardia Act passed in 1932, is the culmination of a bitter political, social and economic controversy extending over half a century. Hostility to 'government by injunction' had become the rallying slogan of many and varied groups. Indeed, as early as 1914 Congress had responded to a widespread public demand that the Sherman Act be amended, and had passed the Clayton Act, itself designed to limit the jurisdiction of federal courts to issue injunctions in cases involving labor disputes. But the proponents of the Norris-LaGuardia Act felt that the jurisdictional limitations of the Clayton Act had been largely nullified by judicial decision. Thus, the Senate Judiciary Committee, reporting the Norris-LaGuardia Act, said: 'That there have been abuses of judicial power in granting injunctions in labor disputes is hardly open to discussion. The use of the injunction in such disputes has been growing by leaps and bounds. * * * For example approximately 300 were issued in connection with the railway shopmen's strike of 1922, * * *' And on the same subject, the House Judiciary Committee said: 'These are the same character of acts which Congress in § 20

of the Clayton Act of October 15, 1914 [20 U.S.C.A. § 52] sought to restrict from the operation of injunctions, but because of the interpretations placed by the courts on this section of the Clayton Act, the restrictions as contained therein have become more or less valueless to labor, and this section is intended by more specific language to overcome the qualifying effects of the decisions of the courts in this respect.' As an example of the judicial interpretation of the Clayton Act which the Committee said was 'responsible in part for this agitation for further legislation,' the Committee referred to the cases of *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; *American Steel Foundries v. Tri-City Central Trades Council*, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360 and *Bedford Cut Stone Co. v. Journeymen Stone Cutters' Assn.*, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791. In these cases, the jurisdiction of the courts to grant injunctions had been upheld upon allegations and findings that the Sherman Anti-Trust Act had been violated.

Whether or not one agrees with the committees that the cited cases constituted an unduly restricted interpretation of the Clayton Act, one must agree that the committees and the Congress made abundantly clear their intention that what they regarded as the misinterpretation of the Clayton Act should not be repeated in the construction of the Norris-LaGuardia Act. For us to hold, in the face of this legislation, that the federal courts have jurisdiction to grant injunctions in cases growing out of labor disputes, merely because alleged violations of the Sherman Act are involved, would run counter to the plain mandate of the Act and would reverse the declared purpose of Congress.

*Milk Wagon Drivers Union v. Lake Valley Farm Products*, 311 U.S. at 102, 61 S.Ct. at 127, 128.

It is apparent that the Supreme Court in the *Milk Wagon Drivers* case did not perceive that the attempted secondary boycott which the union was undertaking in that case violated the antitrust laws. This is true even though the secondary boycott, if successful, would have sheltered the conventional dairies from competition from the "cut-rate" dairies and the "cut-rate" stores.

The first comprehensive effort by the Supreme Court to correlate the Sherman Act, the Clayton Act and the Norris-LaGuardia Act appears in *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941).

The *Hutcheson* case was one in which the local chapter of the United Brotherhood of Carpenters had clearly breached its agreement with Anheuser-Busch, refused to arbitrate a jurisdictional dispute which it had agreed to arbitrate, and had attempted to mount a secondary boycott against Anheuser-Busch products. Despite this clearly reprehensible conduct, and despite the fact that the union conduct would have been clearly violative of the antitrust laws under the previous cases of *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, and *Bedford Cut Stone Co. v. Journeymen Stone Cutters' Assn.*, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, Justice Frankfurter, speaking for the majority of the Court, held that Clayton and Norris-LaGuardia Acts precluded the applicability of the antitrust laws to union activities.

The United Brotherhood of Carpenters and the International Association of Machinists both had collective bargaining agreements with Anheuser-Busch, and both had agreements that any jurisdictional disputes would be submitted to arbitration. The machinists were awarded certain work which the carpenters felt was legitimately theirs. The carpenters declined to submit the jurisdictional dispute to arbitration and instead struck Busch, picketed Busch, struck certain construction companies working on Busch premises to build a new brewery, and instituted or attempted to institute a secondary boycott of Busch products among its members and their friends. Justice Frankfurter carefully analyzed the Clayton and Norris-LaGuardia Acts and found that these statutes, by their terms,

precluded the courts from holding that the union's activities violated the antitrust laws. The heart of Justice Frankfurter's reasoning, clearly applicable to the present case, appears in the following language:

In so far as the Clayton Act is concerned, we must therefore dispose of this case as though we had before us precisely the same conduct on the part of the defendants in pressing claims against Anheuser-Busch for increased wages, or shorter hours, or other elements of what are called working conditions. The fact that what was done was done in a competition for jobs against the Machinists rather against, let us say, a company union is a differentiation which Congress has not put into the federal legislation and which therefore we cannot write into it.

It is at once apparent that the acts with which the defendants are charged are the kind of acts protected by § 20 of the Clayton Act. The refusal of the Carpenters to work for Anheuser-Busch or on construction work being done for it and its adjoining tenant, and the peaceful attempt to get members of other unions similarly to refuse to work, are plainly within the free scope accorded to workers by § 20 for 'terminating any relation of employment,' or 'ceasing to perform any work or labor,' or 'recommending, advising, or persuading others by peaceful means so to do.' The picketing of Anheuser-Busch premises with signs to indicate that Anheuser-Busch was unfair to organized labor, a familiar practice in these situations, comes within the language 'attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working.' Finally, the recommendation to union members and their friends not to buy or use the product of Anheuser-Busch is explicitly covered by 'ceasing to patronize . . . any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do.'

*United States v. Hutcheson*, 312 U.S. at 232, 61 S.Ct. at 466–467.

Justice Frankfurter's treatment in the *Hutcheson* case, of *Bedford Cut Stone v. Journeymen Stone Cutters' Assn., supra,* and *Duplex Printing Press v. Deering, supra,* is also extremely significant. Justice Frankfurter points out:

The underlying aim of the Norris-LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction. . . . The Norris-LaGuardia Act was a disapproval of *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, and *Bedford Cut Stone Co. v. Journeymen Stone Cutters' Assn.,* 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, as the authoritative interpretation of § 20 of the Clayton Act, for Congress now placed its own meaning upon that section.

*United States v. Hutcheson*, 312 U.S. at 236, 61 S.Ct. at 468.

*Duplex Printing Press Co. v. Deering* and *Bedford Cut Stone v. Journeymen Stone Cutters* were both cases decided after the enactment of the Clayton Act in 1914 but before the enactment of the Norris-LaGuardia Act of 1932. Both involved similar facts. Both arose from situations in which unions which had been unsuccessful in obtaining their objectives by strikes, attempted to impose secondary boycotts upon employers with whom they had long-standing disputes. In both instances, the majority of the Supreme Court interpreted the Clayton Act with extreme narrowness and placed the conduct of the unions within the ambit of the anti-trust laws. In 1932, Congress, stirred by what it perceived as the Supreme Court's refusal to follow what Congress thought it had done in the Clayton Act, clarified the matter in the Norris-LaGuardia Act. Finally, in *Milk Wagon Drivers* and *Hutcheson,* the intent of Congress was eventually vindicated. In both *Duplex Printing* and *Bedford Cut Stone,* Justice Brandeis prepared eloquent dissents, which

now in the light of the Norris-LaGuardia Act and *Hutcheson* have considerable precedential force and which make it totally clear that the conduct which the plaintiffs here seek to bring within the ambit of the antitrust laws is immunized from the antitrust laws by the congressional will as expressed in the Clayton and Norris-LaGuardia Acts.

■ None of the subsequent cases in any way dilute the absolute holding of the Supreme Court in *Hutcheson* and *Milk Wagon Drivers* that secondary boycott activity by unions, acting alone, does not violate the antitrust laws.

■ Plaintiffs here seek to avoid the clear thrust of the *Hutcheson* case by arguing that Dick Clark was in effect an "employer group" and thus the union's action in placing Kane on the unfair list may be regarded as a conspiracy between a union and an "employer group." The undersigned is persuaded that the record, as a matter of law, will not permit such a construction of the facts because:

1. Clark himself is a performer and an AFTRA member and not an "employer group"; and

2. The teaching of *American Federation of Labor v. Carroll, supra*, precludes such a result.

Defendants' motion for partial summary judgment could be persuasively predicated upon Justice Frankfurter's opinion in *Hutcheson* and Justice Brandeis' dissents (which history and the Norris-LaGuardia Act have rendered authoritative) in *Bedford Cut Stone* and *Duplex Printing*.[1] More recent cases confirm the conclusion that the motion should be granted.

*Hunt v. Crumboch*, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945) [decided contemporaneously with *Allen Bradley Co. v. Local Union No. 3, infra*] arose from a bitter union-employer dispute between Transpor-

tation Workers Local 197 and Hunt Motor Freight. The union struck all truckers and haulers serving A&P's Philadelphia operations for the purpose of enforcing a closed shop. Violence occurred. One of the Hunt partners was indicted for murder of a union official and acquitted. At the end of the successful strike, the union had successfully organized all of the contractor haulers except Hunt. The union refused to negotiate with Hunt. A&P had entered a closed shop agreement whereby all contract haulers were required to operate with union employees. Hunt lost his contract with A&P at the union's instigation and later had a similar experience with another employer who had agreed to a closed shop agreement. The union effectively punished Hunt for his alleged murder of a union official by driving him out of business.

The majority, in an opinion by Justice Black, refused to apply the antitrust laws to the union activity because:

1. The union had acted alone and not in combination with employer groups. This fact distinguished *Allen Bradley*.

2. A refusal by a union group to sell the labor of its members is not a violation of the Sherman Act. Reliance was placed on *Apex Hosiery, supra* and *Hutcheson, supra*.

The heart of the majority reasoning is expressed in the following language:

The controversy in the instant case, between a union and an employer, involves nothing more than a dispute over employment, and the withholding of labor services. It cannot therefore be said to violate the Sherman Act, as amended. The act does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.

*Hunt v. Crumboch*, 325 U.S. at 826, 65 S.Ct. at 1548.

---

1. See Justice Goldberg's statement in *Jewel Tea, supra*, and *Pennington, supra*, that:

Mr. Justice Brandeis' dissent in *Duplex* has, however, carried the day in the courts of history as evidenced by subsequent congressional action and decisions of this Court. The Norris-

LaGuardia Act, 97 Stat. 70, 29 U.S.C. § 101 (1958 ed.), was passed by congress in 1932 expressly to overrule the majority opinion of *Duplex* and the cases that followed it and to affirm the philosophy of the dissenters in those cases . . .

*Amalgamated Meat Cutters v. Jewel Tea Co., supra,* like the case at bar, involved union efforts to persuade its members to refrain from working for a certain employer. In the case at bar, had the union efforts been successful, Kane could have competed in the Los Angeles and New York markets only by paying his "top stars" the compensation he had agreed to pay in the December 1971 meeting. In *Jewel Tea,* Jewel was, by the union's action, effectively prohibited from competing by selling meat in Chicago in the evening hours. Jewel was understandably disturbed because it had equipped 174 of its 196 stores to vend meat in pre-packaged, self-service systems which Jewel contended did not require a butcher's services. These restrictions upon uninhibited competition in *Jewel Tea* were permissible under the antitrust laws primarily because the restrictions were, in Justice White's language ". . . intimately related to wages, hours and working conditions."

Jewel Tea's controversy with the union arose from Jewel's desire to compete by selling meat after 6:00 p. m., and the meat cutters' desire to spend their evenings at home. The collective bargaining agreement between the Meat Cutters' Union (representing almost all Chicago butchers) and the Associated Food Retailers of Greater Chicago, a trade association of 1,000 merchants accepted a collective bargaining agreement providing that fresh meat would not be sold before 9:00 a. m. or after 6:00 p. m. in either service or self-service markets. During the 1957 contract negotiations Jewel contended that butchers were not necessary in self-service meat sections and sought a relaxation of the previously existing rule. Jewel's demand was ultimately rejected and the new collective bargaining agreement continued the previous restriction. Jewel, under threat of strike, finally accepted the contract but then brought suit alleging that the marketing hours restriction violated the Sherman Act and that the union and its officers had conspired with the employers who were willing to abide by the marketing hours restrictions. As evidence of the conspiracy, Jewel relied upon:

1. The acceptance by Associated Food Retailers of the market-hours restriction;

2. Union's strike threat against Jewel to compel acceptance of the restriction;

3. Refusal of the union to permit its members to work after 9:00 p. m. or before 9:00 a. m.;

4. Refusal by the union to permit any grocery firm to sell meat after 6:00 p. m. or before 9:00 a. m. even in self-service facilities;

5. An agreement by the members of Associated Food Retailers to insist upon the marketing hours restriction in all collective bargaining agreements between the unions and any store operator;

6. Associated Food Retailers' agreement with other employer groups that no firm would sell meat after 6:00 p. m. or before 9:00 a. m. and the action of the union and its officers in enforcing compliance with that agreement.

The Supreme Court opinion by Justice White held that the challenged agreement was exempt from Sherman Act attack because:

1. The trial court had properly found, *as a matter of law,* that there was no evidence of a union-employer conspiracy. This finding was obviously predicated upon the reasoning that negotiations upon a mandatory subject of bargaining and a subsequent collective bargaining agreement would not constitute a conspiracy. In this connection, Justice White said: ". . . We therefore have a situation where the unions, having obtained a marketing-hours agreement from one group of employers, have successfully sought the same terms from a single employer, Jewel, not as a result of a bargain between the unions and some employers directed against other employers, but pursuant to what the unions deemed to be in their own labor union interests." 85 S.Ct. at 1601.

2. The union's demands were "intimately related" to hours and conditions of employment.

In 1942 Justice Frankfurter in *Hutcheson* attempted to render consistent all of the then existing labor laws and the Sherman Act. Justice Goldberg persuasively and skillfully repeated this task in his *Jewel Tea* (concurring) opinion (381 U.S. 676, 85 S.Ct. 1607), which also served as his dissent in *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626. Justice Goldberg's comprehensive, eloquent opinion, and the judicial and legislative history teach that courts should be most reluctant to engage in ". . . intervention via the antitrust route in legitimate collective bargaining." 381 U.S. at 697, 85 S.Ct. at 1608. Justice Goldberg said:

> Stripped of all the pejorative adjectives and reduced to their essential facts, both Pennington and Jewel Tea represent refusals by judges to give full effect to congressional action designed to prohibit judicial intervention via the antitrust route in legitimate collective bargaining. The history of these cases furnishes fresh evidence of the observation that in this area, necessarily involving a determination of 'what public policy in regard to the industrial struggle demands,' *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 479, 485, 41 S.Ct. 172, 183, 65 L.Ed. 349 (dissenting opinion of Mr. Justice Brandeis), 'courts have neither the aptitude nor the criteria for reaching sound decisions.' Cox, Labor and the Antitrust Laws—A Preliminary Analysis, 104 U.Pa. L.Rev. 252, 269–70 (1955); see Winter, Collective Bargaining and Competition: The Application of Antitrust Standards to Union Activities, 73 Yale L.J. 14 (1963).

*Amalgamated Meat Cutters v. Jewel Tea Co.*, 85 S.Ct. 1607.

### III.

### AUTHORITIES ARGUABLY APPLICABLE BUT NOT CONTROLLING

*Allen Bradley Co. v. Local Union No. 3*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945) and *United States v. Brims*, 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403 were cases in which the union had participated in employer conspiracies to fix prices or allocate markets. The consistent holding has been that unions have no exemption or immunity from antitrust liability when the union participates in and becomes a party to a conspiracy of businessmen, even though such participation may result in higher wages and better working conditions.

The evidence in the case at bar establishes lack of "employer group" participation in the defendant's conduct because:

1. Dick Clark, applying the analysis of *American Federation v. Carroll, supra*, was not an "employer group."

2. Even if it were assumed (and there is a complete lack of evidence to support such an assumption) that "employer groups" had complained to the defendants about Kane and that the union responded, no fact issue concerning a "conspiracy" would be created. The defendant unions did nothing to "drive" Kane out of business but on the contrary attempted to and did reach an agreement with him in December 1971 which would enable him to get his business feet on the ground by paying temporarily a wage less than "union scale." Certainly any producer of a "Kane type" show who was required by the union to pay scale to performers who could have been induced to work without monetary compensation might legitimately feel discriminated against if the union made no efforts to obtain similar commitments from Kane. A producer's action in expressing dissatisfaction and the union's response to such a rational complaint could not, in the undersigned's view, provide the basis for a finding of an illegal employer-union conspiracy to violate the antitrust laws.

*Connell Construction Co. v. Plumbers and Steamfitters Local No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975) is distinguishable from the case at bar.

A key element in *Connell* was that the union did not seek to represent and did not represent Connell's employees. In the case at bar, most of the "top stars" were AFTRA members.

The union strategy in *Connell* could have, if successful, given the union the power to exclude subcontractors from the Dallas area. The defendants' activities here could not have excluded Kane from any area because the union attempted to work out a financial arrangement with which Kane could live. In addition, the pertinent documents obligated the union defendants to admit performers to membership, virtually immediately and upon demand.

Local No. 10 in *Connell* had negotiated with the Mechanical Contractors Association a contract containing a "most favored nation" clause, providing that if the union granted more favorable contract terms to any other employee, it would extend the same terms to all members of the association. This inhibited the union's ability to negotiate with individual subcontractors. The defendants here were not similarly inhibited, had committed themselves to no "most favored nations" clause and did in fact negotiate individually with Kane, working out an agreement satisfactory to him in December 1971.

Local No. 10's conduct was improper because it gave the union the power to exclude from the Dallas market a subcontractor whose employees enjoyed wages and working conditions equal to or superior to those of union members but who were able to bid competitively because of greater efficiency. AFTRA and AFTRA locals neither possessed nor sought power of that nature in the case at bar.

The union in *Connell* sought the agreement with the general contractor ". . . solely as a way of pressuring mechanical subcontractors in the Dallas area to recognize it as the representative of their employees." 421 U.S. at 632, 95 S.Ct. at 1839. In the case at bar, AFTRA directly represented most of the "top stars" and sought only an agreement to pay their normal scale and make contributions to AFTRA's pension fund.

The majority opinion (421 U.S. at 632, 95 S.Ct. 1839) condemned the union's conduct on the ground that the union strategy, if approved, would give the union ". . . an almost unlimited organizational weapon." No similar statement can be made concerning the defendants' activities in the present case. The defendants here already represented most of the "top stars" and Kane himself. From one point of view, defendants here were merely seeking to enforce an agreement Kane made in the December 1971 meeting.

A key factor in *Connell* was that the challenged agreement was "outside the context of a collective-bargaining relationship." 421 U.S. at 636, 95 S.Ct. at 1841. The defendants here were endeavoring to enforce Kane's agreement in December to place himself within the bounds of a collective bargaining relationship.

### CONCLUSION

For the reasons stated herein, defendants' motion for partial summary judgment is GRANTED, and plaintiffs' case, insofar as it purports to assert a cause of action predicated on the antitrust laws, is DISMISSED. Plaintiffs' case predicated upon alleged violations of the National Labor Relations Act, the Taft-Hartley Act and the other labor statutes will remain pending.